# United States Court of Appeals
## For the First Circuit

---

No. 00-1650

STATE STREET BANK AND TRUST COMPANY, AS TRUSTEE,

Plaintiff, Appellee,

v.

DENMAN TIRE CORPORATION,
DENMAN OPERATING CORPORATION, AND
THE DENMAN TIRE CORPORATION PENSION PLAN,

Defendants, Appellants,

v.

EAGLE INDUSTRIES, INC.,
EAGLE INDUSTRIAL PRODUCTS CORPORATION, AND
THE EAGLE INDUSTRIES, INC. PENSION PLAN,

Defendants and Cross-Claim Defendants, Appellees.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

---

Before

Torruella, Chief Judge,
Boudin and Lynch, Circuit Judges.

---

Anthony A. Scibelli, with whom Brian E. Whiteley and Scibelli and
Whiteley were on brief for appellants.
Frederick J. Sperling, with whom Paul E. Greenwalt, III, Schiff

Hardin & Wait, Natalie S. Monroe, and Sullivan & Worcester were on brief for defendants and cross-claim defendants-appellees.

Dennis J. Kelly, with whom Renee Inomata and Burns & Levinson were on brief for plaintiff-appellee.

―――――――――――

February 14, 2001

―――――――――――

**LYNCH, <u>Circuit Judge</u>**.  State Street Bank and Trust Company, as the trustee for two pension plans, filed an interpleader complaint to determine which of the two plans should receive $602,462.44 held by the Bank.  A predecessor trustee had mistakenly allocated that sum to the Denman Tire Corporation Plan, taking it from the Eagle Industries Plan at a time when the corporate sponsors of both plans were under common ownership.  Over the objections of the purchaser of the Denman Tire Corporation and the Denman Plan, the district court directed that the sum, plus its accumulated earnings, go back to the Eagle Plan, the original owner.  The district court also held that the action by the purchaser of Denman Tire against the seller, Eagle Industrial Products Corporation (EIPC), the former parent of both Denman Tire and Eagle Industries, was time-barred.

The two Denman entities appeal, saying they were innocent of any wrongdoing and, due to the error as to the assets in the pension plans, an inflated purchase price was paid for Denman Tire.  Further, they say that the Denman Plan had a fiduciary duty to its beneficiaries to make an effort to keep the misallocated monies.  That effort has cost State Street more than $150,000 in legal fees, which it has charged back to the Denman Plan.  In light of these two harms, they say that the Denman Plan should keep the $602,462.44 in misallocated assets, or at least the earnings.  Denman also says the action against

the corporate seller should be reinstated.  We affirm the dismissal of the action.

**I.**

Denman appeals from dismissal of its breach of warranty claim against EIPC, and Denman and the Denman Plan appeal from summary judgment against the Denman Plan on State Street's interpleader complaint.[1] We summarize the facts in the light most favorable to the Denman entities.

At one time, both Denman and Eagle Industries were subsidiaries of EIPC, and each had its own, separate employee ERISA pension plan. In March of 1996, the then-trustee of the plans, Northern Trust, mistakenly allocated $602,462.44 in assets, comprised of mutual funds and a small amount of cash, from the Eagle Plan to the Denman Plan in the course of transferring assets from the plans to a new trustee, State Street Bank and Trust. When State Street took over as trustee of the plans in May, 1996, Northern Trust's error was not detected.

EIPC entered into an agreement on August 30, 1996, to sell all its shares in Denman to Pensler Capital Corporation. The terms of the Stock Purchase Agreement called for Pensler to pay an estimated $8 million at closing, subject to adjustments, and included both a warranty that the Denman Plan was in compliance with ERISA and a

---

[1]     We refer to Denman Tire Corporation and Denman Operating Corporation collectively as Denman; Eagle Industries, Inc., and Eagle Industrial Products Corp. will be referred to as EIPC. The Eagle Plan and the Denman Plan are separate legal entities from their respective sponsors, EIPC and Denman.

provision indemnifying Pensler against loss resulting from any breach of warranty by EIPC. The Agreement also stated that EIPC's warranties and indemnification obligations "shall expire on the second (2nd) anniversary of the closing." In a side letter agreement, EIPC agreed to advise Pensler of the Denman Plan's investments as of the closing date.

Between the signing of the Agreement in August, 1996, and the closing on October 1, 1996, Pensler assigned its rights under the Agreement to Denman. On November 21, 1996, in a post-closing agreement, Denman assumed Pensler's obligations and liabilities under the Stock Purchase Agreement, and EIPC delivered to Denman a statement of the stockholders' equity in Denman as of the closing date for the purpose of adjusting the purchase price, pursuant to the Stock Purchase Agreement. On February 5, 1997, as part of a settlement agreement, Denman agreed to pay EIPC an additional $1,412,800 based on the adjusted figures. None of the parties apparently were aware that during their negotiations the Denman Plan contained $602,462.44 in assets misallocated from the Eagle Plan. They each apparently had documents from which they could have learned this.

In September, 1997, an independent audit of the Eagle Plan uncovered the error. EIPC contacted Denman seeking return of its plan's funds. Denman claimed ownership of the assets on its behalf and on behalf of the Denman Plan. EIPC asserted both EIPC's and the Eagle

-6-

Plan's rights to the funds. Denman and EIPC both notified State Street of their ownership claims. As trustee for the Denman and Eagle Plans, State Street brought an interpleader action to resolve these competing claims, placing the disputed assets in a separate account.

In response, Denman brought a third-party complaint against Northern Trust and a counterclaim against State Street, both for breach of fiduciary duty, and the Denman Plan brought a counterclaim for a declaratory judgment that it owned the assets. Denman also brought a cross-claim against EIPC for breach of the Agreement's warranty that the Denman Plan was ERISA compliant, claiming that Pensler overpaid EIPC to acquire Denman because it relied on State Street's figures, which erroneously included the misallocated assets.

The district court granted the Eagle Plan's motion for summary judgment against Denman and the Denman Plan on both State Street's interpleader complaint and the Denman entities' counterclaim that the Denman Plan owned the disputed assets. The court directed State Street to transfer those assets, which had appreciated in value to $1,091,788.40, to the Eagle Plan. The court also dismissed as time-barred Denman's claim that EIPC was in breach of its warranty in the Stock Purchase Agreement by failing to administer the Denman Plan in accordance with ERISA.[2]

_____

    [2] Northern Trust's motion to dismiss Denman's third-party complaint and State Street's motion for judgment on the pleadings both were allowed. The district court concluded that neither Northern Trust

-7-

nor State Street was liable as a fiduciary under ERISA because each had acted merely in a record keeping capacity. The court also noted that because there was no evidence of harm to the Denman Plan, no damages under ERISA were available. Denman and the Denman Plan do not appeal those decisions.

A. Contractual Statute of Limitations

We review de novo allowance of a Rule 12(b)(6) motion to dismiss, accepting all well-pleaded facts as true and drawing all reasonable inferences in favor of Denman. See Massachusetts Sch. of Law v. American Bar Ass'n, 142 F.3d 26, 40 (1st Cir. 1998). A motion to dismiss should be granted only if it "appears to a certainty that the plaintiff would be unable to recover under any set of facts." Roma Const. Co. v. aRusso, 96 F.3d 566, 569 (1st Cir. 1996); see also LaChapelle v. Berkshire Life Ins. Co., 142 F.3d 507, 509 (1st Cir. 1998) ("Granting a motion to dismiss based on a limitations defense is entirely appropriate when the pleader's allegations leave no doubt that an asserted claim is time-barred."). We also review de novo the district court's interpretation of the contract, a question of law. Principal Mutual Life Ins. Co. v. Racal-Datacom, Inc., 233 F.3d 1, 3 (1st Cir. 2000).

The Stock Purchase Agreement specifies that Illinois law applies. Under Illinois law parties are "free to contract for a time period within which a suit may be brought . . . which [is] less than the general statute of limitation period applicable to written contracts." Board of Educ. v. Hartford Acc. & Indem. Co., 504 N.E.2d 1000, 1005 (Ill. App. 1987); see Koclanakis v. Merrimack Mut. Fire Ins. Co., 899 F.2d 673, 675 (7th Cir. 1990) ("Illinois law recognizes the

validity of reasonable contractual limitations on the time to file suit.").

The dispute here is whether the parties intended to create a statute of limitations in their Agreement. Section 8.1(c) of the Agreement, which expressly applies to the warranty at issue, states that EIPC's representations and warranties "shall expire on the second (2nd) anniversary of the Closing . . .." Denman argues that the language of the Agreement is ambiguous and so the district court erred in dismissing and not considering relevant extrinsic evidence. The Agreement, Denman argues, should be read as imposing only a notice requirement for breach of warranty claims, and not a limitations period. Under this theory, its suit is not barred because it notified EIPC of its claim on June 11, 1998, well within two years of the closing on October 1, 1996.

EIPC argues that the plain language of the Agreement demonstrates that the parties agreed to a two-year statute of limitations for bringing claims under the Agreement, and so Denman's suit, filed in 1999, is too late. Whether contract terms are ambiguous is a question of law for the court. See Outboard Marine Corp. v. Liberty Mut. Ins. Co., 607 N.E.2d 1204, 1212 (Ill. 1992). Ambiguity does not exist where there is mere disagreement about the proper interpretation of a contract, but only if the contractual language is reasonably susceptible to more than one meaning. See Johnstowne

<u>Centre Partnership</u> v. <u>Chin</u>, 458 N.E.2d 480, 481 (Ill. 1983); <u>Seven Bridges Courts Ass'n</u> v. <u>Seven Bridges Development, Inc.</u>, 714 N.E.2d 601, 606 (Ill. App. 1999). The district court concluded that the terms "shall expire" operated as a statute of limitations.

Courts applying Illinois law have construed similar contract language as unambiguously requiring a party to file suit within the stated period. In <u>Latek</u> v. <u>LeaseAmerica Corp.</u>, 1992 WL 170546 (N.D. Ill. July 16, 1992), <u>aff'd</u>, 7 F.3d 238 (7th Cir. 1993), the court rejected the defendant's ambiguity argument, finding that a provision that warranties "shall survive" for 18 months from the closing date "clearly describes a contractual statute of limitations." <u>Id.</u> at *3. <u>See also</u> <u>Commonwealth Fin. Corp.</u> v. <u>USAmeribancs, Inc.</u>, 1987 WL 19142, at *2 (N.D. Ill. Oct. 20, 1987) (cause of action filed over one year after closing was time-barred where provision stated seller shall indemnify buyer for one year after closing). To say that something "shall survive" for a period of time, which the <u>Latek</u> court found to unambiguously imposed a statute of limitations for filing a breach of warranty claim, is very much like saying something "shall expire" <u>after</u> a period of time, the language in the Agreement between EIPC and Denman/Pensler.

We reject Denman's interpretation of the Agreement as merely requiring notice of a breach of warranty claim. Like the Agreement between EIPC and Denman/Pensler, the contract in <u>Latek</u> did not include

-11-

any language stating that a claim for breach of warranty must be filed within the limitations period. Nevertheless, the court found that the language was "reasonably susceptible to only one meaning: that any claim based on warranties contained in the Purchase Agreement must be brought within [the specified time period] of the closing." 1992 WL 170546, at *3; see also Commonwealth Fin. Corp., 1987 WL 19142, at *4 (rejecting plaintiff's argument that limitations period only requires defendant to indemnify plaintiff for any breach that occurs within one year of the closing regardless of when the actions are actually brought). Because Illinois law forecloses the argument, Denman's contract claim filed in 1999 is barred, and so the district court appropriately granted EIPC's motion to dismiss Denman's cross-claim.

B. Restitution of the Misallocated Monies

We review a restitution order under a bifurcated standard: whether restitution is available is a question of law we review de novo, Texaco Puerto Rico, Inc. v. Department of Consumer Affairs, 60 F.3d 867, 874-75 (1st Cir. 1995), while our review of a district court's decision to grant or withhold an equitable remedy is for abuse of discretion, id. at 875.

Because the issues in this case involve the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq., we turn to that statutory scheme first to assess its impact. ERISA here affects the nature of the claims that may be made, who may make them,

and the outcome of the ultimate question.[3] ERISA is a comprehensive statute with a carefully drafted remedial scheme that catalogues parties who may pursue civil actions to redress ERISA violations, as set forth in 29 U.S.C. § 1132(a).  Under § 1132(a)(3), only a "participant, beneficiary, or fiduciary" may seek relief to redress ERISA violations.  Employers and pension funds are not among the enumerated parties empowered to sue for violations of ERISA.  See Kwatcher v. Mass. Serv. Employees Pension Fund, 879 F.2d 957, 964-65 (1st Cir. 1989).

In this case, the Denman Plan asserted a claim for a declaratory judgment that it was the rightful owner of the disputed assets, while the Eagle Plan sought restitution.[4] Despite the limits on standing to sue and remedies available in suits involving ERISA

---

[3]    No party contends that the case is governed by state law principles of restitution, regardless of the consonance or dissonance of those principles with ERISA.

[4]    The limitations on ERISA standing to sue are not directly present here because plaintiff State Street brought an interpleader action under Fed. R. Civ. P. Rule 22, with federal jurisdiction premised on diversity of citizenship between State Street, the stakeholder, and claimants. See 7 C. Wright et al., Federal Practice and Procedure § 1710, at 547 (2d ed. 1986). Although State Street purported to bring its interpleader action under both Rule 22 and statutory interpleader, statutory interpleader is not available in this case based on diversity in federal court because the potential claimants are not diverse.  See 28 U.S.C. § 1335 (providing jurisdiction to federal courts over interpleader actions having "[t]wo or more adverse claimants, of diverse citizenship").  Denman Tire Corporation and Eagle Industrial Products Corporation are both Delaware corporations.

-13-

plans, courts recognize that in certain cases, a party otherwise unable to sue under ERISA may nevertheless pursue a federal common law action for restitution or other equitable relief. Concerned about ERISA's expansive preemptive sweep, the Supreme Court has held that "courts are to develop a federal common law of rights and obligations under ERISA-regulated plans." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 110-11 (1989) (internal quotation marks omitted). "[T]he traditional equitable action for restitution is part and parcel of ERISA's federal common law." Kwatcher, 879 F.2d at 966; accord Luby v. Teamsters Health, Welfare, & Pension Trust Funds, 944 F.2d 1176, 1186 (3d Cir. 1991) ("Although ERISA itself does not explicitly provide a statutory right of restitution, it is clear that Congress intended federal courts to fashion a federal common-law under ERISA, and this permits application of a federal common-law doctrine of unjust enrichment if restitution would not override a contractual provision of an ERISA plan."). But courts are careful not to allow federal common law to rewrite ERISA's carefully crafted statutory scheme, and recognize that federal common law will only give rise to a claim pursuant to ERISA in the limited class of cases "where the issue in dispute is of central concern to the federal statute." Provident Life & Accident Ins. Co. v. Waller, 906 F.2d 985, 990 (4th Cir.) (internal quotation marks omitted), cert. denied, 498 U.S. 982 (1990); see Franchise Tax Bd. v. Construction Laborers Vacation Trust, 463 U.S. 1,

-14-

25-26 (1983); United McGill Corp. v. Stinnett, 154 F.3d 168, 171 (4th Cir. 1998) ("Courts should only fashion federal common law when necessary to effectuate the purposes of ERISA.") (internal quotation marks omitted).

In Kwatcher, we concluded that an employer may pursue a federal common law action for restitution to recover overpayments mistakenly made to an ERISA fund, even though an employer would not have standing to sue under ERISA's civil enforcement provision. We held that the availability of restitution is "fully consonant" with ERISA's policies and supplements ERISA's remedial scheme by "providing a tool for courts to use when one party 'has been unjustly enriched at the expense of another.'" 879 F.2d at 967, quoting Restatement (First) of Restitution § 1 (1937).

Other courts have ordered restitution of disputed ERISA plan assets in actions brought by pension funds and fund trustees, as well as by employers. In Luby, the Third Circuit awarded a plan restitution of payments mistakenly made to a plan beneficiary, concluding that the equitable remedy available to an employer to recover mistaken overpayments to ERISA plans should extend to an ERISA plan itself. See 944 F.2d at 1186. Similarly, in Provident, the Fourth Circuit concluded there was an implied right of action for a plan administrator to pursue a federal common law action for restitution of payments mistakenly made to a plan beneficiary. See 906 F.2d at 989-90.

-15-

Moreover, in Malden Mills Indus., Inc. v. Alman, 971 F.2d 768, 774-75 (1st Cir. 1992), a pension plan's claim for reimbursement from an employer for benefits overpayments was allowed.  We conclude that where funds are mistakenly transferred from one ERISA plan to another, as in the case of funds mistakenly paid into a plan by an employer, a plan is entitled to pursue a federal common law action for restitution to it of its missing funds.  Thus the interpleader action, where both plans seek the funds, is appropriate.

ERISA also impacts the resolution of the ultimate question. At least two ERISA principles are involved.  The first is the principle, embedded in 29 U.S.C. § 1104(a)(A)(i)-(ii), that the exclusive purpose of an ERISA plan is "providing benefits to participants and their beneficiaries" and paying reasonable expenses of plan administration.  The second is the anti-inurement principle embedded in 29 U.S.C. § 1103(c)(1), that plan assets "shall never inure to the benefit of any employer" but "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries . . .."  Restitution in a case such as this does not run afoul of ERISA's policy of protecting employee pension plans because the Denman Plan "[is] not entitled to funds to which [it] had no right in the first place." Kwatcher, 879 F.2d at 967 (citation omitted). Indeed, the rationale in Kwatcher is even more compelling in this case because returning the disputed assets to their rightful owner, the

-16-

Eagle Plan, protects the interests of that pension plan's participants. As in Luby, "[t]o permit restitution here would only further the goals of ERISA, that is to safeguard the corpus of funds set aside under the [Plan] for valid [] Fund beneficiaries."  944 F.2d at 1186.

The Denman Plan argues that restitution is inappropriate because it obtained, as transferee, Denman's rights to the misallocated assets as a bona fide purchaser, cutting off the Eagle Plan's claim to its funds.  See Restatement (First) of Restitution § 172 cmt. a (acquisition by bona fide purchaser "cut[s] off" the constructive trust).  The premise of the argument is questionable.  It is not likely Denman was ever a bona fide purchaser of plan assets.  Plan assets are held in trust for the beneficiaries.  What Pensler purchased, and then transferred to Denman, was a corporation.  Conversely, the Denman Plan was not a bona fide purchaser of anything here.[5]  It received more than $600,000 and paid nothing for the assets.  Similarly, the doctrine under the Restatement (First) of Restitution -- that a bona fide purchase cuts off a constructive trust -- has little application here. This is not a situation of a "constructive" trust (which may arise to offset a fraud) being subverted to a bona fide purchaser where equity must choose which of two innocent victims to compensate.

_____

[5]    We do not suggest that the corporate Denman suffered no harm. The purchase price paid for the corporate Denman may well, as alleged, have been calculated in part based on the value of the assets in the Denman Plan.  If so, then the corporate Denman's recourse was against the seller.  Unfortunately for Denman, it did not act quickly enough.

More fundamentally, even if there were an arguable bona fide purchaser argument available, the structure of ERISA is not hospitable to the Denman entities' argument.  As the Supreme Court has held, "[a]lthough trust law may offer a starting point for analysis in some situations, it must give way if it is inconsistent with the language of the statute, its structure, or its purposes." Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 447 (1999) (internal quotation marks omitted). It would thwart ERISA's purpose of protecting the interests of pension plan members if the Eagle Plan's interest in those misallocated funds was cut off by operation of the bona fide purchaser doctrine here.

Denman also argues the district court was compelled under Kwatcher to do an equitable analysis and that it failed to do so.  We conclude that the district court did, in fact, properly weigh the equitable factors and found them to favor restitution to the Eagle Plan.  Given the two ERISA principles described before -- exclusive benefit and non-inurement -- it would take a very strong showing to tip the equitable balance toward the Denman Plan.  The Eagle Plan has been deprived of assets stemming from payments made on behalf of its plan beneficiaries.  "A person who has been unjustly enriched at the expense of another is required to make restitution to the other." Restatement (First) of Restitution § 1 (1937).

There are some equities on Denman's side, to be sure.  It bears little culpability here, as the mistake was the trustee's.  This

error has imposed costs on Denman and the Denman Plan. If, after the restitution, the Denman Plan would be underfunded by ERISA standards -- and there is no evidence in the record that it would be -- Denman must make payments to bring it up to ERISA-compliant levels.[6] State Street has also extracted over $150,000 from the Denman Plan's account to cover the Bank's attorneys' fees incurred in this litigation. But there are none of the countervailing considerations courts have recognized as reasons not to grant restitution. Restoring the funds to the Eagle Plan would not override an explicit contractual provision in the Denman plan. Cf. Cummings v. Briggs & Stratton Retirement Plan, 797 F.2d 383, 390 (7th Cir. 1986). Nor would it give the Eagle Plan participants benefits not afforded by the Plan document. Cf. Van Orman v. American Ins. Co., 680 F.2d 301, 312 (3d Cir. 1982). It would be unjust to allow the Denman Plan to retain the assets that belong to the Eagle Plan and its beneficiaries. See Kwatcher, 879 F.2d at 967. The district court did not abuse its discretion in ordering restitution.[7]

---

[6] If the misallocation had resulted in overfunding of the Denman Plan -- and again the record is bare -- that would not have produced an increase in benefits to the Plan beneficiaries because the Plan is a defined benefit plan. There is no evidence that the Denman Plan beneficiaries suffered any harm by returning the misallocated assets to the original owner. Cf. Plucinski v. I.A.M. Nat'l Pension Fund, 875 F.2d 1052, 1057-58 (3d Cir. 1989).

[7] We observe the irony of this outcome: the party apparently responsible for this situation, Northern Trust, has escaped liability for any damages resulting from its error. It was Northern Trust that misallocated the funds from the Eagle Plan to the Denman Plan. The Denman entities' claim against Northern Trust was dismissed because

C.  Restitution of Appreciated Value of Assets

Denman argues that the district court erred in ordering restitution of the earned income by ordering restitution of the appreciated value of the disputed assets, $1,091,788.40 at the time of judgment.  The district court ordered State Street to transfer the actual assets misallocated by Northern Trust -- mutual fund shares and a small amount of cash in a short term investment fund -- back to the Eagle Plan.  We are guided by comment a to the Restatement (First) of Restitution § 1 that "[a] person obtains restitution when he is restored to the position he formerly occupied either by the return of something which he formerly had or by the receipt of its equivalent in money."  The investments of the disputed assets remained the same from the time they were misallocated from the Eagle Plan, throughout the time they were in the Denman Plan's account, and until the date judgment entered.  At least in theory, mutual funds increase in value over time, like money in a bank.  In this case, the investments yielded returns.  Had the $602,462.44 remained in the Eagle Plan's account, the Eagle Plan would have seen those assets appreciate similarly.  The misallocated funds are identifiable and their present monetary value has been established.  That the assets might have been invested differently had they remained in the Eagle Plan does not alter the

Northern Trust was not acting as a fiduciary within the meaning of ERISA when it made the accounting error.  Denman does not appeal that decision.

analysis, nor make the matter so speculative as to deny an award, cf. Cambridge Plating Co. v. Napco, Inc., 85 F.3d 752, 771 (1st Cir. 1996) ("Because every calculation of lost profits has some element of uncertainty, a plaintiff need not calculate lost profits with mathematical exactness.") (internal quotation marks omitted). Thus, the district court properly ruled that the Eagle Plan is entitled to restitution of the appreciated assets. Cf. Luby, 944 F.2d 1179 (awarding restitution with interest of mistakenly paid benefits).

This case is unlike Kwatcher, where we noted that the employer was entitled to restitution of its overpayments only, as awarding interest that accrued while the funds were retained by the pension plan would offend ERISA's anti-inurement principle by benefitting the employer at the expense of the plan. See 879 F.2d at 967. Here, the Eagle Plan is entitled to restitution of its assets and the gains realized while in the Denman Plan's account, gains which will inure to the benefit of the Eagle Plan's participants. Moreover, the court ordered restitution of the trust corpus itself (the assets in their present, appreciated form), not a fixed cash award; that the Eagle Plan elected to have the assets returned in their cash equivalent, rather than the mutual fund shares, does not change our conclusion.

**III.**

We affirm the district court's orders. No costs are awarded.

-21-