**Lucien J. DANDURAND, Plaintiff**

v.

**UNUM LIFE INSURANCE COMPANY OF AMERICA, Defendant**

**Civil No. 00–220–P–C.**

United States District Court, D. Maine.

July 23, 2001.

Graydon Stevens, Kelly, Remmel & Zimmerman, Portland, ME, for plaintiff.

Patricia A. Peard, Ronald W. Schneider, Jr., Bernstein, Shur, Sawyer, & Nelson, Portland, ME, for defendant.

## MEMORANDUM OF DECISION AND ORDER

CARTER, District Judge.

This ERISA case involves a dispute over the entitlement of Plaintiff, Lucien Dandurand, to long-term disability benefits under Defendant Unum's Group Long Term Disability Insurance Policy Number 379228 (hereinafter "the Policy"), Dandurand's Claim File, Defendant's Ex. 25, at UA–791, between July 20, 1994, and August 28, 1999, and whether Plaintiff or Defendant, Unum Life Insurance Company of America (hereinafter "Unum"), should now bear the cost of a five-year-long mistake made by Unum in its calculation of Dandurand's eligibility for disability benefits under the Policy. A bench trial was held to determine whether Unum should recoup any overpayment it made to Dandurand during the relevant time period. Consideration of the evidence and the parties' legal arguments has led the Court to conclude, for the reasons discussed below, that Unum should not recoup any overpayment it

made to Dandurand under the Policy between July 20, 1994, and August 28, 1999.

## FACTUAL BACKGROUND

Dandurand has been an employee of the Dingley Press for sixteen years. The Dingley Press has maintained a long-term disability insurance plan for its employees, provided by Group Long Term Disability Insurance Policy No. 379228, since September 1, 1993. *See* The Policy at L1. Unum issued and serves as administrator of the Policy. As an employee of the Dingley Press, Dandurand is entitled to benefits under the Policy.

In 1994, Dandurand was diagnosed with cardiomyopathy, an inflammation of the heart muscle. This condition causes Dandurand to experience a lack of energy and fatigue, and it reduces his ability to handle stress. Because of this condition, Dandurand had to reduce his working hours in 1994, and he submitted a claim for disability benefits under the Policy. In September 1994, Unum approved Dandurand's benefits claim and began issuing Dandurand long-term disability benefits (hereinafter "LTD benefits") that month.[1]

Dandurand continued to work part time at the Dingley Press and received LTD benefits under the Policy's partial disability provision, *see* The Policy at L–DEF–4, on an ongoing basis until August 19, 1999. Unum paid Dandurand a sum of $85,442.55 in LTD benefits between July 20, 1994, and August 19, 1999. *See* Joint Stipulations ¶ 1. Because a participant's benefit for a partial disability varies according to a participant's basic monthly earnings and other income benefits under the terms of the Policy, *see* The Policy at L–BEN–1, Dandurand's LTD benefits varied throughout this time period. Dandurand testified that, throughout this period, the combination of his LTD benefits and his income from the Dingley Press generally resulted in an amount approximate to the income that he had been earning prior to the onset of his disability—about $60,000 per year. During the time period between July 1994 and August 1999, the responsibility of managing Dandurand's claim file passed through a series of four Unum employees: Thomas Grant, Leigh Quinn, Tracy Sawyer, and Craig Beaulieu.

In August 1999, Unum determined that it had erroneously failed to include Dandurand's bonuses in its calculation of Dandurand's current earnings while determining Dandurand's eligibility for LTD benefits for the years 1995 to 1999. While this error was made on a number of occasions between the years 1995 and 1999, the first and most significant exclusion of Dandurand's bonus income consisted of Grant's failure to include a bonus that Dandurand had received in 1995 in determining whether Dandurand was partially disabled in 1995. Because the Policy defines partial disability in terms of loss in current earnings due to an individual's injury or sickness, *see* The Policy at L–DEF–4, the inclusion of this bonus as part of Dandurand's 1995 current earnings would have rendered Dandurand nondisabled under the terms of the Policy for that year.[2]

---

[1]. This amount included benefits for part of the month of July and the month of August. Unum had found Dandurand's disability to have begun on January 21, 1994, and had applied the Policy's six-month elimination period to arrive at the date of July 20, 1994, as the starting date for his disability payments. *See* Letter from Thomas Grant to Lucien Dandurand (September 26, 1994), Dandurand's Claim File at UA–047.

[2]. Specifically, the Policy's partial disability provision deems an individual eligible for LTD benefits if, "while unable to perform all of the material duties of his regular occupation on a full-time basis," the individual "is performing at least one of the material duties

However, Grant had not included this bonus in its calculation of Dandurand's 1995 current earnings because, instead of using box 2 of Dandurand's 1995 W–2 form to determine these earnings, he had taken Dandurand's 1995 weekly earnings, multiplied them by 52, and then divided this product by 12. Grant engaged in this calculation despite the fact that he was aware of the bonus and had the relevant W–2 forms available to him at the time that he determined Dandurand's 1995 eligibility. This error went undetected by at least the three other Unum employees who were responsible for Dandurand's file throughout the years 1995 to 1999 and who continued to derive Dandurand's current earnings from his weekly earnings instead of using box 2 of his W–2 forms. Grant's initial exclusion of bonus income in 1995 had ramifications for Dandurand's eligibility for disability benefits and the calculation of Dandurand's disability benefits for the subsequent years during this time period.[3] Unum claims that, because of the mistaken exclusion of the 1995 and other

bonus income from Dandurand's current earnings, it overpaid Dandurand by $67,957.18 through August 28, 1999. *See* Joint Stipulation ¶ 3.

In August 1999, Unum also determined that Dandurand was no longer eligible for benefits under the Policy. Dandurand appealed this decision and Unum's determination that it had overpaid him through August 1999. As a result of this appeal, Unum determined that Dandurand was still disabled within the meaning of the Policy and resumed payment of his benefits. However, Unum did not change its determination that it had overpaid Dandurand through August 1999,[4] and Unum began deducting from Dandurand's reinstated monthly benefits to recoup that amount. Each month since August 1999, Unum has retained the entire amount of Dandurand's benefits in furtherance of its goal to recoup the $67,957.18 that it contends Dandurand has been overpaid under the Policy. Through this recoupment effort, Unum offset $17,277.60 in benefits through March 31, 2000. *See id.* ¶ 4.

of his regular occupation on a part-time or full-time basis and ... earning currently at least 20% less per month than his indexed pre-disability earnings due to that same injury or sickness." The Policy at L–DEF–4. The Policy defines an individual's pre-disability earnings as "the insured's basic monthly earnings in effect just prior to the date his disability began adjusted on the first anniversary of benefits payments and each following anniversary." *Id.* at L–DEF–2. Under the Policy, basic monthly earnings are determined from the box on the insured individual's W–2 form that "reflects wages, tips and other compensation," or, in instances in which a W–2 form was not received, "for the period of employment." *Id.* at L–PS–2. Although the Policy does not explicitly state that bonuses are to be included in a calculation of basic monthly earnings, it is generally understood that bonuses are reflected in box 2 of an employee's W–2 form, the box that "reflects wages, tips, and other compensation." The Court ruled at summary judgment that it was

not unreasonable, therefore, for Unum to use box 2 of the W–2 form in order to calculate a participant's current earnings.

3. For a detailed discussion of these ramifications, see the Court's April 3, 2001, Memorandum of Decision and Order (Docket No. 17).

4. Unum's position on the amount of overpayment has changed throughout the course of this litigation. Initially, Unum claimed that it had overpaid Dandurand $70,859.28. *See* Letter from Craig Beaulieu, Disability Benefit Specialist, to Lucien J. Dandurand (Nov. 14, 1999), Dandurand's Claim File at UA–551. In its Counterclaim, Unum asserted that it was entitled to an amount of $64,800.00 plus interest. *See* Answer and Affirmative Defenses and Counterclaim (Doc. No. 3) ¶ 3. Subsequent to the Court's April 3, 2001, Memorandum of Decision and Order, the parties stipulated that the amount of overpayment is $67,957.18. *See* Joint Stipulation ¶ 3.

The 1995 bonus that is the source of Unum's claimed erroneous $67,957.18 overpayment to Dandurand was awarded to Dandurand in recognition of his efforts to return to work despite his disabling condition. This bonus was significantly larger than other yearly bonuses that have been awarded to Dandurand, amounting to $7,266.12. *See* Letter from Michael Letourneau to Thomas Grant (January 12, 1996), Plaintiff's Ex. 5. Letourneau testified that before the Dingley Press awarded Dandurand that bonus, Letourneau called Grant some time in December 1994 to ensure that the bonus would not negatively affect Dandurand's LTD benefits. According to Letourneau, Grant stated that because the bonus had nothing to do with weekly earnings and was a one-time bonus, it would not affect Dandurand's LTD benefits.

Unum disputes that Grant made this statement. Grant testified that he does not remember making this statement to Letourneau, and that if he had represented that the 1995 bonus would not be included in the calculation of Dandurand's current earnings, he would have documented this representation in the file and would likely have written a letter confirming the substance of this representation. While no such letter exists in Dandurand's file and the file does not contain detailed notes of a statement regarding a 1995 bonus, the file does contain documentation of a December 1994 conversation between Letourneau and Grant in which Grant could have made such a statement. Specifically, the file contains notes of a conversation that took place between Grant and Letourneau on December 29, 1994, and it indicates the following:

10:40 a.m. phone mail message

10:45 a.m. spoke with Michael

Discussed WIB & prop loss—partial

Will be doing year-end reviews and needed to know how a change in salary changes his benefit with Unum.

Advised we need actual RTW earnings when calculating partial disability ongoing.

Michael advised he will be obtaining all requested info from our 12/21/94 letter and mailing it to us today

11:55 a.m. spoke with Michael.

Wanted to know when benefits—cease—

Explained when no longer disabled or R & L's allow him to be released to full time to increase earnings—no earnings loss

He did advise his position has changed somewhat—they may be reducing his responsibilities & lower his salary.

Dandurand's Claim File at UA–063, Defendant's Ex. 59.

The Court finds that Grant did make the representation that the bonus would not affect Dandurand's eligibility for benefits. The Court found Letourneau to be a credible witness, and various documents in Dandurand's file demonstrate that Letourneau has consistently believed that Grant did make the statement, including notes of statements made by Letourneau to Unum employees after Unum detected the error, *see, e.g.,* Telephone Conversation Notes, Dandurand's Claim File at UA–513 (recording conversation with Letourneau in which Letourneau stated "[w]e were told bonuses didn't affect that by Tom Grant" and questioned whether Grant was still working at Unum); Telephone Conversation Notes, Dandurand's Claim File at UA–511, and letters written by Letourneau separating bonus income from other income. *See* Letter from Micheal Letourneau to Thomas Grant (January 12, 1996), Plaintiff's Ex. 5; Letter from Michael Letourneau to Leigh Quinn (January 8, 1997), Plaintiff's Ex. 7; Letter from Micheal Letourneau to Tracy Sawyer (March 10,

1998), Plaintiff's Ex. 13. Letourneau testified that he separated the bonus information from the rest of Dandurand's income in his letters reporting Dandurand's income because he had understood from his conversation with Grant that bonuses would not be included in the calculation of Dandurand's current earnings. Although Grant testified that he does not remember making this statement, Grant testified that he was responsible for approximately 125 files at a time, making the possibility that he would specifically recall making such a statement highly unlikely. While Grant also testified that he would have documented such a statement and documentation of this specific statement does not exist in Dandurand's claim file, the Court believes that the documentation of the December 1994 phone conversation between Grant and Letourneau sufficiently accounts for the possibility that a statement regarding the effect of bonuses on the calculation of proportionate loss for partial disability status was made. Moreover, Grant behaved consistently with the representation that bonuses would not reduce Dandurand's benefits by deriving Dandurand's monthly income from his weekly income instead of including Dandurand's bonuses in his calculation of Dandurand's current earnings, despite the fact that he had bonus information available to him at the time that he engaged in the calculation.

The evidence indicates that Unum had conducted periodic reviews of Dandurand's file on at least two occasions before it detected the erroneous calculation of Dandurand's current earnings. The first of these reviews, conducted in January 1997, revealed that Unum had overpaid Dandurand $716.00 in benefits during the 1996 year, and requested that Dandurand refund that amount to Unum. *See* Letter from Leigh Quinn to Lucien J. Dandurand (January 8, 1997), Defendant's Ex. 34.

Dandurand responded to this letter by requesting that the overpayment be deducted from his next benefit check. *See* Telephone Conversation Notes, Dandurand's Claim File at UA–297, Defendant's Ex. 32. The second of these reviews, conducted in January 1999, indicated that Unum had underpaid Dandurand in the amount of $1,444.10 during the disability period between July 20, 1996, and January 19, 1999. *See* Letter from Craig Beaulieu to Lucien Dandurand (January 25, 1999), Defendant's Ex. 30. Unum sent Dandurand a check to account for this underpayment. Despite these reviews, the erroneous exclusion of Dandurand's benefits by at least four Unum employees remained undetected until August 1999.

Dandurand has suffered and continues to suffer hardship as a result of Unum's recoupment efforts. Throughout 1994 to 1999, Dandurand used his LTD benefits, including the overpayment at issue in this case, to pay his monthly living expenses. Dandurand testified that while he had lived a fairly financially conservative lifestyle prior to the time that Unum began its recoupment efforts, he and his wife now struggle to pay their monthly bills. His wife has recently left a job that she prized for an approximate $4,000 yearly salary increase. Nevertheless, his family's yearly income—the sum of his wife's salary, his salary, and the LTD benefits that he takes home—is approximately $20,000 less than it was prior to Unum's recoupment efforts. If Dandurand continues to receive the same amount of benefits as he is currently receiving, it will take approximately five years for Unum to recoup the entire amount of benefits through its method of retaining Dandurand's complete monthly benefits payment. If Dandurand's disability causes him to work less in the future and Unum continues complete reduction of his benefits in its recoupment efforts, he

may face even more significant hardships in meeting his monthly bills. Dandurand spent the overpayment on monthly living expenses as it was distributed and has little, if any, savings. Hence, Dandurand does not have available resources with which to pay Unum the amount that it plans to recoup from his benefits. Due to his disabling condition, he is unable to work extra hours or take on another job to earn the money to repay Unum.

At trial, Unum did not offer any definitive testimony on the effect that an inability to recoup the $67,957.18 overpayment would have on Defendant. John Gale, a Senior Specialist at Unum, testified that any overpayment has an effect on the company's accounting that is ultimately distributed amongst a policy's beneficiaries. With regard to explaining the effect of $67,957.18 on the company or its beneficiaries, however, Gale was able to testify only that, although this amount may seem small in light of Unum's size and financial status, seemingly small errors do have a cumulative effect. Gale stated that he did not feel qualified to testify about the specific effect of the amount of overpayment at issue in this case.

## DISCUSSION

At its inception, this case involved issues of the reasonableness of Unum's recalculation of Dandurand's benefits under the Policy, Unum's asserted contractual right to recoup any overpayments, Unum's entitlement as trustee of the Policy to recoup any overpayments, and Unum's claim for recoupment as an equitable remedy. The Court's April 3, 2001, Memorandum of Decision and Order (Doc. No. 17) resolved

many of the issues pertaining to the reasonableness of Unum's interpretation of the Policy in its recalculation of Dandurand's benefits. The Court held a bench trial on the remaining issues in the case. Prior to trial, the parties stipulated to the amount of overpayment based on the Court's April 3, 2001, Memorandum of Decision and Order, resolving the remaining reasonableness issues for the purposes of the trial.[5] *See* Joint Stipulations ¶ 3. In its opening argument, Unum represented to the Court that it is no longer pursuing its contractual or trust claims as independent grounds for recoupment.[6] Hence, the only remaining issue to be resolved by this Memorandum of Decision and Order is whether Unum should be granted equitable relief in the form of restitution of the overpayment made to Dandurand between July 20, 1994 and August 28, 1999.

■■■ By recouping the overpayment, Unum has availed itself of the equitable remedy of restitution. The parties' briefs raise three issues regarding the propriety of this remedy. First, the parties dispute whether, given the circumstances of the overpayment, restitution is an appropriate equitable remedy for Unum. Second, Dandurand claims that Unum should be estopped from recouping the erroneous overpayment. Third, Dandurand argues that because Unum has breached its fiduciary duty, Unum is not entitled to restitution. As the Court will explain below, consideration of the equities in this case and ERISA's guiding principles has led the Court to conclude that restitution is not an appropriate remedy. Therefore, the Court

---

**5.** Plaintiff entered into this stipulation without waiving his right to appeal the Court's April 3, 2001, Memorandum of Decision and Order.

**6.** Specifically, Unum represented to the Court that it had abandoned the contractual claim

and that it viewed its claim to recoup the overpayment as trustee of the Policy as encompassed by its equitable claim for recoupment.

will not address the issues of estoppel or breach of fiduciary duty.[7]

■ The parties do not dispute that "the traditional equitable action for restitution is part and parcel of ERISA's federal common law.'" *State Street Bank and Trust Co. v. Denman Tire Corp.*, 240 F.3d 83, 89 (1st Cir.2001) (quoting *Kwatcher v. Mass. Serv. Employees Pension Fund*, 879 F.2d 957, 964–65 (1st Cir.1989)). However, the parties do disagree over what framework should guide the Court's equitable analysis. Dandurand urges the Court to apply the principles set forth in Section 254, comment d, in the RESTATEMENT OF TRUSTS, which provides:

> If the trustee by mistake or otherwise makes an overpayment to the beneficiary, he cannot recover the amount of the overpayment from the beneficiary personally or out of the beneficiary's interest in the trust estate, if the beneficiary had no notice that he was overpaid and has so changed his position that under all the circumstances it is inequitable to the beneficiary to permit such recovery. Among the circumstances which may be of importance in determining whether it is inequitable to allow the trustee indem-

nity are the following: (1) what disposition has been made by the beneficiary of the amount by which he was overpaid; (2) the amount of the overpayment; (3) the nature of the mistake made by the trustee, whether he was negligent or not; (4) the time which has elapsed since the overpayment was made.

RESTATEMENT OF TRUSTS, Section 254, comment d. Unum contests the application of this framework, arguing that the First Circuit has not accepted this analysis in the ERISA context and that the application of this standard contradicts cases in the First and Third Circuits indicating that mistake or negligence does not determine the issue of restitution. *See* Defendant's Post–Trial Brief (Docket No. 26) at 15 (citing *State Street Bank and Trust Co.*, 240 F.3d at 90, 92; *Luby v. Teamsters Health, Welfare, and Pension Trust Funds*, 944 F.2d 1176, 1186 (3rd Cir. 1991)). Unum also contends that the Court must evaluate the propriety of recoupment in light of a presumption that Unum is entitled to restitution that " 'requires a very strong showing' by Dandurand to tip the equitable balance back in his favor." Defendant's Post–Trial Brief at 12 (quoting *State Street Bank and*

---

7. In any event, Dandurand has waived his estoppel argument by failing to plead it in his reply to Defendant's counterclaim. Federal Rule of Civil Procedure 8(c) requires a party to set forth a number of affirmative defenses, including estoppel, "[i]n pleading to a preceding pleading." Affirmative defenses not set forth in pleadings are generally deemed to have been waived. *See Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.*, 15 F.3d 1222, 1226 (1st Cir.1994); *Federal Deposit Ins. Co. v. Ramirez–Rivera*, 869 F.2d 624, 626 (1st Cir. 1989); *Badway v. United States*, 367 F.2d 22 (1st Cir.1966). In his reply to Unum's counterclaim, Dandurand set forth only two affirmative defenses: (1) that Unum's claim was barred by the statute of limitations; and (2) that "Unum's claim for recoupment should be denied because recoupment under the circumstances of this case would be inequita-

ble." Reply to Counterclaim (Doc. No. 5) at 4. Dandurand argues that because estoppel is an equitable remedy, by pleading that recoupment would be inequitable, he satisfied the pleading requirements of Rule 8(c). The Court does not find this argument persuasive. Rule 8(c) specifically lists estoppel as an affirmative defense that must be pled. Particularly in this case, in which Dandurand advances other equitable arguments against Unum's recoupment efforts, the Court's consideration of his estoppel argument would undermine the notice function of Rule 8(c). *See Knapp Shoes*, 15 F.3d at 1227. While the Court of Appeals for the First Circuit has recognized a number of exceptions to the rule that a party has waived an affirmative defense by not pleading it, *see, e.g., id.*, Dandurand has not argued that any of these exceptions apply to the instant case.

*Trust Co.,* 240 F.3d at 90). Unum urges the Court to evaluate the propriety of restitution in light of the parties' reasonable expectations of payment and "society's reasonable expectations of person and property," *Provident Life Accident Ins. Co. v. Waller,* 906 F.2d 985, 993–94 (4th Cir.1990), as well as ERISA's principles that ERISA plans serve the exclusive purpose of " 'providing benefits to participants and their beneficiaries' " and that plan assets may " 'never inure to the benefit of any employer' " but solely to participants and beneficiaries. *State Street Bank and Trust Co.,* 240 F.3d at 89–90 (quoting 29 U.S.C. §§ 1103(c)(1), 1104(a)(1)(A)(i)-(ii)). Unum's position is that these considerations should lead the Court to conclude that restitution is appropriate in this case. Unum also argues that even under the analytical framework of Section 254, comment d, the equities weigh in favor of restitution.

The Court does not view itself as bound by either of the particular frameworks that have been proposed by the parties. In *Kwatcher,* the Court of Appeals declined to set forth the specific factors that should guide an ERISA restitutionary analysis, other than to comment that "[e]quity, after all, is meant to be flexible," and to instruct that "[t]he trial court should consider whatever factors it may reasonably believe shed light on the fairness of reimbursement, and weigh those factors against the backdrop of general equitable considerations and the guiding principles and purposes of ERISA." *Kwatcher,* 879 F.2d at 967. The Court will, therefore, evaluate the evidence presented at trial in light of traditional equitable considerations and ERISA's guiding principles of exclusive protection of participants and anti-inurement.

 The Court finds that several factors weigh against restitution. First, the fault occurred through no fault of Dandurand. Unum made the error in its calculation of his current earnings and allowed it to continue for a period of four years. While Unum is correct in asserting that a party's mistake does not necessarily preclude restitution, *see Luby,* 944 F.2d at 1186–87, a party's culpability is an appropriate equitable consideration. *See State Street Bank and Trust Co.,* 240 F.3d at 90 (considering parties' culpability in evaluating whether to affirm district court's grant of restitution). The Court finds that the relative culpability in this case, particularly in light of the length of time it took Unum to determine that four of its employees had been erroneously interpreting the Policy, weigh against restitution. Although Unum argues that the Policy's language unambiguously requires the inclusion of bonus information in the calculation of current earnings and the Court has previously held that this interpretation was not unreasonable, the Court does not regard the language in the Policy as unambiguously requiring the inclusion of bonus income in current earnings. While the Policy does explicitly require the use of box 2 of a participant's W–2 form in calculating predisability basic monthly earnings, *see* the Policy at L–PS–2, the current earnings definition does not directly refer to W–2 forms or bonuses. The evidence presented at trial portrayed a scenario in which Unum allowed at least four employees to calculate current earnings in a manner to exclude bonus income, only to determine four years into a participant's receipt of benefits that a different calculation method better comported to the Policy's definition of current earnings. The Court does not believe that it would be equitable to make Dandurand bear the weight of an error that Unum could have prevented by closer supervision, better training, or a consistent interpretation of the Policy.

Second, the Court finds that Dandurand was not placed on notice that Unum had been mistakenly including bonuses. The $67,957.18 did not occur in one lump payment that would have put Dandurand on notice that Unum was overpaying him, but occurred in monthly installments over a period of four years. Moreover, instead of notifying Dandurand that bonuses would count towards his current earnings, Grant specifically told Letourneau that Dandurand's 1995 bonus would not affect Dandurand's eligibility for LTD benefits under the Policy. While Unum's recoupment of an overpayment in 1997 and reimbursement for an underpayment in 1999 did indicate that both Dandurand and Unum reasonably expected that Dandurand should only receive benefits which he was entitled to under the Policy and that overpayments and underpayments would be accounted for, this evidence also indicates that it was reasonable for Dandurand to believe that Unum conducted its accounting on a periodic basis and that it would correct payment errors within a reasonable period of time. Allowing an interpretation error to persist for four years despite a series of recurring reviews and adjustments does not fall within a reasonable period of time. Nor does the Court find that restitution in this case would comport with society's reasonable expectations of person and property. Given the length of time it took Unum to detect its error, the number of Unum employees who had perpetuated this error, Unum's representation that bonuses would not count, the evidence of Unum's periodic audits of Dandurand's file, and the ambiguous language in the Policy, restitution would not further reasonable societal expectations of person and property.

Additionally, the Court believes that Dandurand's disposition of the overpayment weighs against restitution. Dandurand did not put this money towards any extravagant purchases, but used it to pay his monthly living expenses over a period of four years. It was not treated by him as a windfall. Unum argues that this factor weighs in favor of restitution because it demonstrates that Dandurand did not change his position in reliance on the erroneous overpayment. The Court is not persuaded by this argument. As a result of the reasonable expenditure of his LTD benefits, Dandurand does not have the money to repay Unum the overpayment at this point in time, and restitution in the form of recoupment of Dandurand's monthly disability payments over the next five years will make it extremely difficult for Dandurand to continue to meet his monthly living expenses. In contrast, Unum did not offer any definitive evidence regarding the effect that a sum of approximately $68,000 would have on the beneficiaries of the Policy. Indeed, Gale, the Senior Specialist who testified on behalf of Unum, stated that he was not qualified to testify as to the effects of this amount on the Policy's fund or its beneficiaries, and Unum did not submit any documentation that would enable the Court to assess its effect. Given this lack of evidence, the Court is not persuaded that ERISA's exclusive beneficiary and non-inurement principles require restitution in order to safeguard the corpus of funds for plan members and their beneficiaries.

 The Court is aware that ERISA's principles of anti-inurement and protecting funds for participants and their beneficiaries generally weigh in favor of restitution. *See State Street Bank and Trust Co.*, 240 F.3d at 90. However, the Court believes that Dandurand has put forth "a very strong showing" that the equities weigh in his favor, *id.*, making restitution an inappropriate remedy in this case. Hence, the Court will deny Unum's counterclaim for restitution.

## CONCLUSION

Given the equitable factors discussed above, the Court denies Unum's cross-claims for recoupment. The Court, therefore, **ORDERS** that Unum cease deducting money from Dandurand's monthly payments under the Policy and that Unum refund to Dandurand the sum of money that it has thus far deducted from his monthly payments in its effort to recoup the $67,957.18 overpayment.