Robert **HERRING**, Sr.; Robert Herring, Jr.; Charles Herring, Plaintiffs,

v.

**TERADYNE, INC.** a Massachusetts corporation; Stuart Osattin, an individual, Richard Schneider, an individual, Defendants.

**No. CIV.01 CV 1835–L(JFS).**

United States District Court, S.D. California.

Nov. 7, 2002.

Timothy R. Pestotnik, Luce Forward Hamilton and Scripps, San Diego, CA, for Plaintiffs.

Gregory A. Vega, Seltzer Caplan McMahon Vitek, San Diego, CA, Brian I. Cheng, Bingham McCutchen, Los Angeles, CA, Jason D. Frank, Stephen D. Whetstone, Jordan D. Hershman, Testa Hurwitz and Thibeault, Boston, MA, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

LORENZ, District Judge.

On October 28, 2002, this matter came on regularly for a hearing on Defendants' motion for partial summary judgment. Timothy R. Pestotnik and Russell A. Gold of Luce, Forward, Hamilton & Scripps, LLP appeared for the Plaintiffs. Jordan D. Hershman of Testa Hurwitz & Thibeault, LLP and Gregory A. Vega of Seltzer Caplan McMahon Vitek appeared for Defendants.

### *FACTUAL BACKGROUND*

Plaintiff Robert Herring Sr. founded a company known as Herco Technology Corporation ("Herco"). (Second Amended Complaint ("SAC") ¶ 1.) He ran the company since its inception with his sons, Plaintiffs Robert Herring Jr. and Charles Herring. *Id.* Herco prospered and became an attractive acquisition target as one of the last remaining independent, family-owned printed circuit board fabricators. *Id.* Beginning in March 2000, the Plaintiffs received multiple offers from other companies to acquire Herco. (SAC ¶¶ 1, 12.) In June 2000, Defendant Teradyne, Inc. ("Teradyne") joined in the bidding. (SAC ¶¶ 2, 13.) Plaintiffs were represented in the transaction by Robert Copeland of Luce, Forward, Hamilton & Scripps LLP. Teradyne was represented by William B. Asher of Testa, Hurwitz & Thibeault, LLP.

Plaintiffs eventually sold Herco and another company owned by Robert Herring, Sr. called Perception Laminates, Inc. d.b.a. Synthane Taylor, to Teradyne in exchange for $122 million in Teradyne stock (no cash). (SAC ¶¶ 2, 13–14.) Plaintiffs were the sole shareholders of Herco. (SAC ¶ 4.) Plaintiff Robert Herring Sr. was the sole shareholder of Synthane. *Id.*

Defendant Stuart Osattin, an officer and Treasurer of Teradyne, and Defendant Richard Schneider, an officer of Teradyne, negotiated Teradyne's purchase of Herco and Synthane. (SAC ¶¶ 6, 7, 14.) Osattin and Schneider met several times with the Plaintiffs to negotiate the purchase from early June through the close of the sale on August 15, 2000. (SAC ¶ 14.)

On July 29, 2000, Osattin and Schneider scheduled a sudden, unexpected meeting with Plaintiffs in San Diego. (SAC ¶¶ 15, 16.) At the meeting, Osattin and Schneider insisted that Teradyne and Plaintiffs agree to lock in the stock price for the Plaintiffs' acquisition of Teradyne stock at that time, rather than using the previously agreed-to formula, which was the average of the closing stock price for the 10 days prior to the execution of the final agreement. *Id.* Osattin and Schneider told Plaintiffs the reason Teradyne wanted to lock in the stock price was so Teradyne could grant stock options to its employees. (SAC ¶ 17.) They explained that because Teradyne's stock was trading at a "historic low," employees wanted to acquire stock options now to earn greater profits when Teradyne's stock price increased. *Id.* Osattin and Schneider told the Herrings that unless Teradyne issued the stock options then, it would have considerable problems with its employees who would miss the coming appreciation in Teradyne's stock value. *Id.* Osattin and Schneider also told the Plaintiffs that Teradyne wanted to close the deal quickly and would do so in

just a few days. *Id.* The Plaintiffs agreed to lock in the price that they would acquire Teradyne stock at $66.26 per share. *Id.* The Closing Date of the transaction was August 15, 2000. (SAC ¶ 14.)

In October 2000, after the Closing, Charles Herring spoke with Osattin while attending a Teradyne meeting at the Rancho Bernardo Inn. (SAC ¶ 19.) Osattin admitted that contrary to Osattin and Schneider's representations on July 29, Teradyne was in fact concerned that the stock price would continue to drop, not rise. *Id.* The more the stock price dropped, the more stock the Plaintiffs would receive because the deal was $122 million in stock. *Id.* Osattin told Charles Herring that Teradyne felt that a trip to San Diego to lock in the price with the Plaintiffs was "worth around $5 million to Teradyne," because Teradyne believed the stock would likely drop more after the meeting but before the deal closed. *Id.*

After the Closing and the October 2000 meeting, Plaintiffs learned that Teradyne's true performance was spiraling downwards during the period of time it was negotiating with Plaintiffs. (SAC ¶ 20.) Plaintiffs also learned that Teradyne's STS orders had dropped approximately 30% in the second quarter 2000 as compared to the first quarter, and dropped an additional 20% in the third quarter. *Id.* Plaintiffs argue the Defendants concealed this fact by commingling the results of its STS business with other divisions when reporting on the company's performance. (SAC ¶ 21.) Plaintiffs argue the information was material because the STS business accounts for the vast majority of Teradyne's revenue and profit. (SAC ¶¶ 22, 24–27.)

### PROCEDURAL BACKGROUND

On September 5, 2001, Plaintiffs filed this action in San Diego Superior Court alleging violations of California Corporations Code, common law fraud, and breach of contract. Defendants removed the action based on diversity jurisdiction. Plaintiffs subsequently amended the complaint. In relevant part, Plaintiffs allege Defendants breached Sections 5.11 and 5.13 of the Merger Agreements. Section 5.11 of the Merger Agreements is a Material Adverse Change ("MAC") clause, providing that except as expressly disclosed in reports filed with the SEC since December 31, 1999, there has not been any material adverse change in the business, assets, condition, or results of operation of Teradyne. Section 5.13 of the Merger Agreements state that Teradyne did not make any untrue statements of material fact or omissions of material fact in the Merger Agreements. Section 11.01 provides in relevant part that certain representations and warranties—including those in Sections 5.11 and 5.13 survive only until the first anniversary of the Closing Date.

Defendants moved to dismiss the First Amended Complaint. On January 28, 2002, at the hearing on the motion, this Court granted in part and denied in part Defendants' motion to dismiss. One issue in the motion to dismiss was whether Plaintiffs' breach of contract claims are contractually time-barred under Section 11.01. After receiving supplemental briefing from the parties on this issue the Court denied the motion to dismiss, but expressly stated that Defendants could present evidence in support of their argument on summary judgment.

On March 4, 2002, Plaintiffs filed a Second Amended Complaint that incorporated the Court's rulings on the motion to dismiss. Defendants now move for summary judgment, arguing that the first sentence of Section 11.01 of the Merger Agreements creates a contractual statute of limitations that bars Plaintiffs' breach of contract claims. Plaintiffs oppose, and maintain the first sentence of Section 11.01 only sets

forth the time period in which a breach can occur.

## APPLICABLE LAW REGARDING SUMMARY JUDGMENT MOTIONS

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is material when it affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Freeman v. Arpaio,* 125 F.3d 732, 735 (9th Cir.1997).

The party moving for summary judgment bears the initial burden of establishing an absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. Where the party moving for summary judgment does not bear the burden of proof at trial, it may show that no genuine issue of material fact exists by demonstrating that "there is an absence of evidence to support the non-moving party's case." *Id.* at 325, 106 S.Ct. 2548. The moving party is not required to produce evidence showing the absence of genuine issue of material fact, nor is it required to offer evidence negating the moving party's claim. *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 885, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *United Steelworkers v. Phelps Dodge Corp.,* 865 F.2d 1539, 1542 (9th Cir.1989). Rather, "the motion may, and should, be granted so long as whatever is before the District Court demon-strates that the standard for the entry of judgment, as set forth in Rule 56(c), is satisfied." *Lujan,* 497 U.S. at 885, 110 S.Ct. 3177 (*quoting Celotex,* 477 U.S. at 323, 106 S.Ct. 2548).

Once the moving party meets the requirements of Rule 56, the burden shifts to the party resisting the motion, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505. If the non-moving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548.

## DISCUSSION

### I. Applicable Law Regarding Contract Interpretation.

▮▮▮ The goal of contract interpretation is to give effect to the parties' mutual intent. Cal. Civ.Code § 1636; *Bank of the West v. Superior Court,* 2 Cal.4th 1254, 1264, 10 Cal.Rptr.2d 538, 833 P.2d 545 (1992); *Southern Pac. Transp. v. Santa Fe Pac. Pipelines, Inc.,* 74 Cal.App.4th 1232, 1240, 88 Cal.Rptr.2d 777 (1999). "It is the outward expression of the agreement, rather than a party's unexpressed intention, which the court will enforce." *Winet v. Price,* 4 Cal.App.4th 1159, 1166, 6 Cal.Rptr.2d 554 (1992). When parties dispute the meaning of language in a contract, "the court must decide whether the language is 'reasonably susceptible' to the interpretations urged by the parties." *Badie v. Bank of Am.,* 67 Cal.App.4th 779, 798, 79 Cal.Rptr.2d 273 (1998).

▮▮▮ In determining whether the contract is reasonably susceptible to a party's interpretation, the court looks at the lan-

guage of the document itself. *Id.* Where contractual language is clear and explicit, it governs. *Bank of the West,* 2 Cal.4th at 1264, 10 Cal.Rptr.2d 538, 833 P.2d 545. In addition, the court may consider parol evidence, "not to vary or modify the terms of the agreement but to aid the court in ascertaining the true intent of the parties [citation], not to show that the parties meant something other *than* what they said but to show what they meant *by* what they said." *Denver D. Darling, Inc. v. Controlled Env'ts Constr., Inc.,* 89 Cal. App.4th 1221, 1236, 108 Cal.Rptr.2d 213 (2001) (internal quotations omitted) (alterations in original); *see Winet,* 4 Cal. App.4th at 1165, 6 Cal.Rptr.2d 554 ("The test of whether parol evidence is admissible to construe an ambiguity is not whether the language appears to the court unambiguous, but whether the evidence presented is relevant to prove a meaning to which the language is 'reasonably susceptible.' "). Accordingly, whether a court admits parol evidence is a two step process:

> First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine "ambiguity," i.e., whether the language is "reasonably susceptible" to the interpretation urged by a party. If in light of the extrinsic evidence the court decides the language is "reasonably susceptible" to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step—interpreting the contract.

*Winet,* 4 Cal.App.4th at 1165, 6 Cal. Rptr.2d 554.

■ A contract that is capable of more than one reasonable interpretation is ambiguous. *Badie,* 67 Cal.App.4th at 798, 79 Cal.Rptr.2d 273. When a court is "[f]aced with contract language that is reasonably susceptible to more than one meaning, certain general rules of contract interpretation come into play to aid the court in resolving the ambiguity." *Southern Pac.,* 74 Cal.App.4th at 1240, 88 Cal. Rptr.2d 777. First, the words of a contract are understood in their ordinary and popular sense unless the parties ascribe a technical or special meaning. *Id.* The court must "determine the ultimate construction to be placed on the ambiguous language by applying the standard rules of interpretation" to give effect to the parties' mutual intent. *Badie,* 67 Cal.App.4th at 798, 79 Cal.Rptr.2d 273. Further, the court can consider the circumstances under which a contract was negotiated, including its object, nature, and subject matter. Cal. Civ.Code § 1647; Cal.Civ.Proc. Code § 1860; *Southern Pac.,* 74 Cal. App.4th at 1240, 88 Cal.Rptr.2d 777; *Badie,* 67 Cal.App.4th at 800, 79 Cal.Rptr.2d 273. "The terms of a writing can also 'be explained or supplemented by course of dealing or usage of trade or by course of performance.' " *Southern Pac.,* 74 Cal. App.4th at 1240, 88 Cal.Rptr.2d 777 (*quoting* Cal.Civ.Proc.Code § 1856(c)).

■ Contract interpretation is a question of law unless the interpretation turns upon the credibility of extrinsic evidence. *Badie,* 67 Cal.App.4th at 799, 79 Cal.Rptr.2d 273. Courts ascertain the intent of the parties by considering the contract as a whole, not an isolated provision. *Id.* at 800, 79 Cal.Rptr.2d 273. In so doing, the court "must be mindful of the rule that, '[h]owever broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract.' " *Id.* (*quoting* Cal. Civ.Code § 1648). The court must also interpret the contract in a manner that makes the agreement "lawful, operative, definite, reasonable, and capable of being carried into effect" while "avoid[ing] an interpretation that would make it harsh, unjust or inequitable." *Id.* at 800, 79 Cal.Rptr.2d 273. While the

intent of the parties determines the meaning of the contract, the relevant intent is objective, as evidenced by the words of the instrument, not a party's subjective intent. *Id.* at 802 n. 9, 79 Cal.Rptr.2d 273; *Shaw v. Regents of Univ. of California*, 58 Cal. App.4th 44, 54–55, 67 Cal.Rptr.2d 850 (1997).

## II. *Interpretation of Section 11.01's First Sentence.*

■ The sole issue before this Court is whether the first sentence of Section 11.01 of the Merger Agreements constitutes a one-year contractual statute of limitations, as Defendants contend, or instead, sets forth the period of time during which a breach can occur, as Plaintiffs argue. Section 11.01 provides that the representations and warranties contained in, *inter alia*, paragraph 5 of the Merger Agreements survive only until the first anniversary of the Closing date, with certain exceptions:

> **11.01** *Survival.* The covenants, agreements, representations and warranties of the parties hereto contained in this Agreement or in any certificate or other writing delivered pursuant hereto or in connection herewith shall survive the Closing until the first anniversary of the Closing Date or (i) in the case of Sections 6.05 and 7.02, for the period set forth therein, (ii) in the case of Sections 6.06 and 7.01, indefinitely, (iii) in the case of the items set forth in Section 11.02(f), for the periods set forth therein, and (iv) in the case of the covenants, agreements, representations and warranties contained in Sections 3.17 and 8.05, until the expiration of the applicable statutory period of limitations (giving effect to any waiver, mitigation or extension thereof), if later. No claim for indemnity under this Agreement with respect to any breach of any representations, warranties and/or covenants of Company and/or Seller shall be made after the applicable period specified in the preceding sentence and all such claims shall be made in accordance with the applicable provisions of the Escrow Agreement.

(SAC Exhs. 1 and 2, Merger Agreements § 11.01.)

■ Defendants contend that the meaning of survival clauses as contractual statutes of limitations is firmly established, and support their argument with citations to numerous non-binding authorities, including cases, treatises, and articles. They further argue that Plaintiffs' proffered interpretation would not make sense and is not supported by any authority. Plaintiffs, in turn, contend that survival clauses are *not* uniformly interpreted as contractual statutes of limitations and that the term "survive" does not suggest a limitation in the time within which a party can file lawsuits.[1] According to Plaintiffs, for a survival clause to constitute a statute of limitations, it is not sufficient for the clause to state that representations and warranties survive for a specified period of time. Rather, the parties must set forth explicit language stating that the clause is a limitations provision. Plaintiffs support their interpretation by analyzing the first sentence of Section 11.01 vis-à-vis its carve out provisions, the second sentence of Section 11.01, and other sections in the Merger Agreement governing claims. In addition, Plaintiffs argue that accepting Defendants' interpretation would mean that the Plaintiffs have, in effect, unintentionally waived their right

---

1. Plaintiffs cite the definition of "survive" in *Black's Law Dictionary:*

> To continue to live or exist beyond the life, or existence of; to live through in spite of; live on after passing through; to remain alive; exist in force or operation beyond any period or event specified.

*Black's Law Dictionary* 1446 (6th ed.1990).

to assert a breach of contract claim within the period allowed under California law. Under California law, a waiver must be knowing and intentional, and because there is no evidence that Plaintiffs intended such a waiver, the first sentence of Section 11.01 should not be read as a contractual statute of limitations.

■■■■ In California, "[c]ontractual stipulations which limit the right to sue to a period shorter than that granted by statute are not looked upon with favor because they are in derogation of the statutory limitation. Hence, they should be construed with strictness against the party invoking them." *Lewis v. Hopper*, 140 Cal.App.2d 365, 367, 295 P.2d 93 (1956) (internal quotations omitted) (alteration in original). Nevertheless, this rule "should not be used to destroy the effect of the words of the contract itself." *Sanders v. American Cas. Co.*, 269 Cal.App.2d 306, 309, 74 Cal.Rptr. 634 (1969). Thus, California courts will enforce an agreement to shorten California's four-year statute of limitations for breach of a written contract provided it is reasonable. *See Hambrecht & Quist Venture Partners v. American Med. Int'l*, 38 Cal.App.4th 1532, 1548, 46 Cal.Rptr.2d 33 (1996).

■■■ As an initial matter, Plaintiffs urge this Court to follow California Civil Code section 1654 and construe any uncertainty in the interpretation of the disputed language against Teradyne because it drafted the survival clause. This argument is not persuasive. In California, where an agreement is actively negotiated—as were the Merger Agreements in this action—this "preparer" principle is not applied against either party. *In re Miller*, 253 B.R. 455, 459 n. 2 (N.D.Cal. 2000), *aff'd*, 284 B.R. 121 (N.D.Cal.2002); *Dunne & Gaston v. Keltner*, 50 Cal.App.3d 560, 563 n. 3, 123 Cal.Rptr. 430 (1975).

In this case, there is no conflict over the extrinsic evidence nor credibility issues.

Accordingly, the interpretation of the first sentence of Section 11.01 is a question of law this Court can decide on summary judgment. *See United Ass'n Local 38 Pension Trust Fund v. Aetna Cas. & Sur. Co.*, 790 F.2d 1428, 1430 (9th Cir.1986).

■■■ Construction of the disputed survival clause is aided by consideration of what happens when a contract does *not* provide that the representations and warranties survive the closing of a transaction. Under those circumstances, the representations and warranties made in the agreement are treated as extinguished as of the closing date, and cannot thereafter give rise to liability. This point is discussed in a treatise by Samuel C. Thompson, Jr., entitled *Business Planning for Mergers and Acquisitions:*

> representations and warranties are statements of fact as of the date of the execution of the acquisition agreement, and the truthfulness of the representations and warranties as of both the date of execution and, when appropriate, the date of the closing is generally a condition to the closing. If prior to closing a party discovers that a representation or warranty is materially inaccurate, the party can refuse to close and possibly sue for damages. If, however, the party does not discover the inaccurate representation and warranty until after the closing, then the question becomes whether the breaching party can be sued for damages for breach of the representation and warranty.
>
> The resolution of this issue depends at first instance on whether the representations and warranties survive the closing date, and this will in many cases be addressed in the acquisition agreement. In an acquisition of a publicly-held firm, ... the representations and warranties and other agreements typically do not survive the closing because as a practical

matter it would be difficult to hold the public shareholders of the target liable for breach. . . .

On the other hand, in acquisitions of closely-held corporations, it is common for the acquisition agreement to provide that the representations, warranties and other agreements survive the closing, ... This means that after the closing, the selling shareholders or the acquiring corporation, as the case may be, may be sued for damages for breach of a representation, warranty, or other agreement.

Samuel C. Thompson, Jr., *Business Planning for Mergers and Acquisitions* 779–80 (2d ed.2001). Other treatises and articles Defendants cite similarly note that where representations and warranties do not survive the closing they cannot be sued upon after the closing date. *See Sale of Stock Agreement*, in *Drafting Agreements for the Sale of Business* 221 (1988) (noting that a provision that the parties' representations and warranties "shall expire with, and be terminated and extinguished by, the Closing, and consummation of the Closing shall be conclusive evidence that each party is fully satisfied with the facts constituting the basis of the representations and warranties of the other parties and with the performance of their obligations" extinguishes the seller's liability for its representations and warranties and therefore indemnities with respect to those matters would also terminate); Michael L. Italiano, *et al., Environmental Due Diligence During Mergers and Acquisitions,* 10–SPG Nat. Resources & Env't 17 (1996); (noting that "[t]he purchaser should require that the representations and warranties survive the closing, otherwise the purchaser cannot sue based on facts discovered after closing"); Dennis L. Greenwald & Michael Asimow, *Purchase and Sale Agreement,* in *California Practice Guide Real Property*

*Transactions* at § 4:454 (2001) ("The duration for which the representations and warranties exist should be identified. Unless expressly provided otherwise, they merge into the deed and do not survive (and thus cannot be sued on after) the closing.").

■ Thus, for a party to be able to sue for a breach of a representation or warranty, it is necessary that those representations and warranties survive the closing. A provision that all representations, warranties, covenants and agreements "shall survive the Closing" is a "simple but broad provision [that] ensures that the buyer's consummation of the closing will not be construed as a waiver or termination of the seller's representations, warranties, and agreements." *Sale of Stock Agreement, supra,* at 221; *see* Thompson, *supra,* at 779–80 (noting that whether a party can sue for a breach of a representation or warranty "depends at first instance on whether the representations and warranties survive the closing date"). When parties provide for representations and warranties to survive the closing, they can also specify the period of time within which those representations and warranties survive. *See* Greenwald & Asimow, *supra,* § 4:454 ("the parties may find it desirable to specify a short statute of limitations for bringing suit based on the breach of any representation"); *Sale of Stock Agreement, supra,* at 222 (noting that a provision that representations and warranties shall be deemed to survive the closing but expire on the first anniversary date following the closing sets a cutoff date for liability and is a contractual limitation of actions).

■ The cases the parties cite are also helpful to the Court's analysis. Defendants rely on two unpublished decisions from district courts in this Circuit in support of their interpretation.[2] *TakeCare,*

---

**2.** In ruling on the motion to dismiss, the

Court found that the unpublished decisions

*Inc. v. Lincoln Nat'l Corp.*, 1995 U.S. Dist. LEXIS 21721 (C.D.Cal. Dec. 18, 1995) and *Lincoln Nat'l Corp. v. TakeCare, Inc.*, 1998 WL 281290 (N.D.Cal. May 11, 1998) arose out of disputes over the same stock purchase agreement. *Lincoln Nat'l*, 1998 WL 281290 at *1, *TakeCare*, 1995 U.S. Dist. LEXIS 21721 at *1. The stock purchase agreement included a cutoff date for claims based on representations and warranties made therein. *Lincoln Nat'l*, 1998 WL 281290 at *4; *TakeCare*, 1995 U.S. Dist. LEXIS 21721 at *20–21. Specifically, section 9.01, entitled "Survival of Representations and Warranties," stated:

> The representations and warranties, respectively made by Seller, on the one hand, and Purchaser, on the other hand, in this Agreement or in any certificate or other document delivered by Seller or Purchaser respectively pursuant to this Agreement will survive the Closing (i) indefinitely with respect to matters covered by Sections 3.02 and 3.04 ... or (ii) for a period equal to the later of (A) one year following the Closing Date and (B) March 31, 1993 in the case of all other representations, warranties, covenants, and agreements, except that (x) any representation or warranty that would otherwise terminate as set forth above shall survive if notice shall have been given in good faith based on facts which would reasonably be expected to establish a valid claim hereunder on or prior to such termination date until the related claim for indemnification has been satisfied or otherwise resolved ....

*Lincoln Nat'l*, 1998 WL 281290 at *4; *TakeCare*, 1995 U.S. Dist. LEXIS at *20–21.

In *TakeCare*, the Buyer sued the Seller, seeking indemnity under the stock purchase agreement for damages Buyer paid in a lawsuit filed by a third party. The Buyer and Seller agreed that section 9.01(a) created a one-year statute of limitations. *See TakeCare*, 1995 U.S. Dist. LEXIS at *20–26. As a preface for discussing section 9.01(a), the Honorable Audrey B. Collins quoted James C. Freund's *Anatomy of a Merger* statement that " 'it is not unreasonable that there should be a cut-off date beyond which the purchaser cannot assert claims.' " *Id.* at 20 (*quoting* James C. Freund, *Anatomy of a Merger*

---

Defendants cited were from outside of this district and not binding on this Court. The Court also noted that under Ninth Circuit Rule 36–3, neither parties nor courts in the Ninth Circuit may cite to an unpublished disposition as precedent. Ninth Cir. R. 36–3; *Schmier v. United States Court of Appeals for the Ninth Circuit*, 279 F.3d 817, 825 (9th Cir.2002); *Hart v. Massanari*, 266 F.3d 1155, 1180 (9th Cir.2001). Accordingly, the Court declined to consider whether the unpublished decisions required it to find that Plaintiffs' claims are barred by the statute of limitations at that stage of the proceedings.

Teradyne now argues that Ninth Circuit Rule 36–3 only applies to unpublished decisions of the Ninth Circuit, and not to unpublished dispositions of other courts, such as decisions of district courts within the Ninth Circuit. In support, Teradyne cites *Alvarenga–Villalobos v. Reno*, 133 F.Supp.2d 1164 (N.D.Cal.2000) and *In re Antablian*, 140 B.R.

534 (C.D.Cal.1992). In *Alvarenga–Villalobos*, the Northern District of California held that Ninth Circuit Rule 36–3 does not bar a citation to an unpublished Third Circuit decision. *Alvarenga–Villalobos*, 133 F.Supp.2d at 1168. Similarly, in *In re Antablian*, the court held that Ninth Circuit Rule 36–3 does not bar citation to unpublished opinions of courts other than the Ninth Circuit. *In re Antablian*, 140 B.R. at 536.

Having reviewed those cases, the Court agrees with Defendants that Ninth Circuit Rule 36–3 should not bar this Court from considering the unpublished decisions Defendants have cited, and therefore that portion of the motion to dismiss order relying upon Ninth Circuit Rule 36–3 is reconsidered. Nevertheless, as noted in the motion to dismiss order, those decisions are not binding, and at most, can only be persuasive authority on this Court.

§ 10.2.2 (1975)). The dispute centered on whether section 9.01's contractual limitations period was tolled. Buyer argued that under section 9.01, if Seller had notice of facts that would reasonably have been expected to establish a claim of indemnity, the warranties and representations made by Seller would survive until the termination of the indemnity claim. *Id.* at 22–23. Judge Collins disagreed with this interpretation, finding that under Buyer's interpretation, the limitations period could conceivably never end. *Id.* at 24. Seller, in contrast, argued that the one-year limitations period was tolled only if Buyer provided notice in good faith of a potential claim of indemnity within one year. *Id.* at 23. Judge Collins found Seller's interpretation more persuasive, stating that as a matter of plain English, section 9.01 implied that Buyer had to give notice in good faith of a possible indemnity claim. *Id.* at 23–24. Judge Collins therefore held that Buyer's express indemnity cause of action was time-barred. *Id.* at 25–26.

Three years later, in *Lincoln Nat'l,* the Seller sued the Buyer, alleging the Buyer breached the stock purchase agreement by failing to pay a portion of the purchase price as required by the third amendment to the stock purchase agreement. *Lincoln Nat'l,* 1998 WL 281290 at *4. Buyer in turn contended that the Seller could not enforce the third amendment because Seller had misrepresented its wholly-owned subsidiary's compliance with governmental laws, regulations, and requirements. *Id.* Seller responded that Buyer's claim regarding Seller's representations was time-barred. *Id.* at *5. Again, at issue in the case was whether the misrepresentation claim was time-barred under section 9.01(a) of the stock purchase agreement. *Id.*

Buyer argued that the existence of facts establishing a misrepresentation or breach of warranty was sufficient to toll the contractual limitations period. *Id.* The court rejected that argument, finding it would mean there would be no limitations period and section 9.01(a) would be rendered meaningless. *Id.* Instead, the court held that to toll the contractual limitations period, Buyer would have had to give Seller notice within a year of the closing date of possible claims arising from misrepresentations or breaches of warranties, or of facts which could reasonably be expected to establish such claims. *Id.* Because Buyer first gave actual notice of its claims over three and one half years past the date for tolling the contractual limitations period, Buyer's misrepresentation claim was time-barred. *Id.*

Defendants maintain that *TakeCare* and *Lincoln Nat'l* establish that survival clauses—such as the one at issue in this action—should be construed as contractual statutes of limitations. These cases are instructive insofar as the courts noted that the survival clause set forth a limitations period and discussed generally the use of survival clauses as contractual statutes of limitations. This Court, however, disagrees with Defendants that these cases are dispositive of the issue presented in this action. As Plaintiffs correctly argue, the parties in *TakeCare* and *Lincoln Nat'l* did not debate whether section 9.01 of the stock purchase agreement limited the time in which to file suit. Rather, those cases turned on whether timely notice had been given to toll the limitations period.

Plaintiffs contend *TakeCare* and *Lincoln Nat'l* are also inapposite because the survival clause in those cases contained a notice provision that expressly limited the time within which a lawsuit could be filed. In particular, Plaintiffs distinguish the cases based on the clause's language that "any representation or warranty that would otherwise terminate as set forth above shall survive if notice shall have been given in good faith based on facts

which would reasonably be expected to establish a valid claim hereunder on or prior to such termination date until the related claim for indemnification has been satisfied or otherwise resolved." Plaintiffs maintain that because the first sentence of Section 11.01 does not contain a notice provision similar to section 9.01 of *TakeCare* and *Lincoln Nat'l*, it is not a contractual statute of limitations. At the hearing, Plaintiffs further argued that notice under a survival clause is synonymous as the filing of a lawsuit.

Plaintiffs' arguments are not persuasive. First, rather than being necessary to make the survival clause a statute of limitations, the notice requirement in *TakeCare* and *Lincoln Nat'l* served as a tolling provision. Indeed, both the *TakeCare* and *Lincoln Nat'l* courts described the notice provision as such. In *Lincoln Nat'l*, the court stated that "[i]n order to toll the contractual limitations period, FHP/Take Care would have had to give LNC notice within a year of the closing date, i.e., before May 8, 1993, of possible claims arising from misrepresentations or breaches of warranties, or of facts which could reasonably be expected to establish such claims." *Lincoln Nat'l*, 1998 WL 281290 at *5. Similarly, in *Take-Care* the court found that notice in good faith had to be given within one year of the closing date in order to toll the contractual limitations period. *TakeCare*, 1995 U.S. Dist. LEXIS 21721 at *23–24.

The Court is also not persuaded with Plaintiffs' argument that equates notice of a claim with the filing of a lawsuit. It is possible to give a party notice of a possible claim without actually suing that party. For example, in *TakeCare* and *Lincoln Nat'l* there was no dispute that notice was given; the issue was whether the notice was timely. Significantly, notice in those cases was not given by the filing of a lawsuit. Rather, in *TakeCare*, the Buyer gave the Seller notice of a claim giving rise

to indemnity by sending to the Seller a letter with a copy of the complaint the third party had served on the Buyer. *TakeCare*, 1995 U.S. Dist. LEXIS 21721 at *11, *25. Similarly, in *Lincoln Nat'l*, the Buyer gave the Seller "actual notice of its claims" "in a letter dated November 19, 1996 from B. Boyd Hight, counsel for [Buyer], to Jack Hunter, [Seller's] General Counsel." *Lincoln Nat'l*, 1998 WL 281290 at *5.

To further support their argument that a survival clause must explicitly state that the time within which to file suit to be a statute of limitations, Plaintiffs urge the Court to consider the second sentence in Section 11.01. The second sentence of Section 11.01 provides:

> No claim for indemnity under this Agreement with respect to any breach of any representations, warranties and/or covenants of Company and/or Sellers shall be made after the applicable period specified in the preceding sentence and all such claims shall be made in accordance with the applicable provisions of the Escrow Agreement.

(SAC Exhs. 1 and 2, Merger Agreements § 11.01.) Plaintiffs contend that the first sentence of Section 11.01 extends the period that representations, warranties, and covenants in the Agreement survive beyond the closing, and the second sentence limits the period within which Teradyne can bring a claim for indemnity against the Herrings. Plaintiffs emphasize that this second sentence expressly limits the period to bring certain claims, and therefore demonstrates that when the parties truly intended to limit certain claims, they understood how to do so and expressly did so. Plaintiffs argue that other sections of the Merger Agreements and in the companion Escrow Agreements contain similar claims limitation language.

 A survival clause need not state the word "claim" or "file" to constitute a

contractual limitations period. For example, in *Latek v. LeaseAmerica Corp.,* 1992 WL 170546 (N.D.Ill. July 16, 1992), the survival clause stated:

> *Survival of Representations and Warranties.* All representations and warranties contained in this Agreement (including any certificate or exhibit hereto) shall survive any investigation made at any time with respect to any of the foregoing and shall survive the execution, delivery and performance of this Agreement for a period of 18 months from the Closing Date.

*Latek,* 1992 WL 170546 at *2.

There, the defendants filed counterclaims alleging the plaintiffs breached the warranties in the purchase agreement certifying that the loss reserves were adequate. *Id.* at *1. The defendants argued that the survival clause was ambiguous, and alternatively contended that the clause did not constitute a contractual statute of limitations but instead defined the period of time during which all warranties and representations were to extend. *Id.* at *2. Accordingly, defendants maintained that if the sellers' warranty was breached within 18 months of the closing, they could bring suit within the 10 year statute of limitations under Iowa law. *Id.*

The court began its analysis by rejecting defendants' ambiguity argument, stating that "[w]e find [the survival clause] clearly describes a contractual statute of limitations, and the language of [the clause] is reasonably susceptible to only one meaning: that any claim based on warranties contained in the Purchase Agreement must be brought within eighteen months of

the closing." *Id.* at *3. The court further found that defendants' interpretation would not make sense because it would require plaintiffs to warrant the companies' loss reserves for 18 months after relinquishing control of the companies. *Id.*

■ Similarly, the stock purchase agreement in *State St. Bank & Trust Co. v. Denman Tire Corp.,* 240 F.3d 83 (1st Cir.2001) stated that the representations and warranties "shall expire on the second (2nd) anniversary of the Closing ...." *State St.,* 240 F.3d at 87. The cross-claimant argued that this language imposed only a notice requirement for a breach of warranty claims, and not a limitations period. *Id.* The cross-defendant argued that the language constituted a statute of limitations, so the cross-claim was time-barred. *Id.* The First Circuit agreed with the cross-defendant, noting that courts applying Illinois law [3] construed similar contract language "as unambiguously requiring a party to file suit within the state period." *Id.* In so holding, the First Circuit cited *Latek,* stating that "[t]o say that something 'shall survive' for a period of time, which the *Latek* court found to unambiguously impose[ ] a statute of limitations for filing a breach of warranty claim, is very much like saying something 'shall expire' *after* a period of time, the language in the Agreement" at issue in *State St. Id.* at 88. Notably, the First Circuit further noted that:

> the contract in *Latek* did not include any language stating that a claim for breach of warranty must be *filed* within the limitations period. Nevertheless, the court found that the language was "rea-

---

**3.** Like in California, in Illinois parties are "free to contract for a time period within which a suit may be brought ... which [is] less than the general statute of limitation period applicable to written contracts." *State St.,* 240 F.3d at 87 (internal quotations omitted)

(alteration in original). Also like California, however, Illinois strictly construes such agreements against the party invoking them. *Michigan Ave. Nat'l Bank of Chicago v. Evans. Inc.,* 176 Ill.App.3d 1047, 1058, 126 Ill.Dec. 245, 531 N.E.2d 872 (1988).

sonably susceptible to only one meaning: that any claim based on warranties contained in the Purchase Agreement must be brought within [the specified time period] of the closing."

*Id.* (*quoting Latek,* 1992 WL 170546 at *3) (alteration in original).

Plaintiffs also contend that to read the first sentence as a stand alone contractual of limitations would improperly render the second sentence surplusage. Defendants respond that the second sentence of Section 11.01 harmonizes the Merger Agreements with the procedures set forth in the accompanying Escrow Agreements governing the notice and arbitration of such claims, which apply solely to Teradyne's claims against the Escrow Fund. The Court agrees with Defendants. The parties entered into Escrow Agreements to secure certain indemnification obligations Plaintiffs owed to Defendants. (SAC Exhs. 1, 2, Escrow Agreement at 1.) The Escrow Agreements provide how claims giving rise to indemnification under those

agreements will be resolved, and also how and when notice must be given. (SAC Exhs. 1, 2, Escrow Agreements §§ 2.2., 2.3.) Accordingly, the second sentence of Section 11.01 clarifies when an action for indemnity can be brought.

Further, the other portions of the Merger Agreements and accompanying documents containing the word "claim" do not support Plaintiffs' argument. Plaintiffs first cite Sections 11.02(f)(i) and (ii) of the Merger Agreement. Those clauses provide that the sellers (Plaintiffs) will indemnify Defendant for environmental liabilities.[4] Notwithstanding their use of the term "claim," these provisions do not state when an action must be filed.

Similarly, the second example Plaintiffs cite—Section 2.2 of the Escrow Agreements—also fails to support their contention. As noted above, Section 2.2 of the Escrow Agreements governs the manner in which Defendants were to give Plaintiffs notice of claims giving rise to indemnification rights under the Escrow Agreement.[5]

4. Sections 11.02(f)(i) and (ii) state in full:

(f) Notwithstanding anything herein to the contrary, and without giving effect to the limitations set forth in the last two sentences of Section 11.02(a), each Seller, jointly and severally, hereby indemnifies Buyer, Merger Sub and, effective at the Closing, without duplication, the Company, and agrees to hold them harmless from and against, all Damages or demands incurred, claimed against, or suffered by Buyer, Merger Sub or the Company arising out of the following:

(i) any inaccuracy or breach of any representation or warranty in Section 3.19 [regarding compliance with environmental laws] (provided that Sellers' obligations to indemnify and hold harmless Buyer and Company shall apply only with respect to claims arising prior to the tenth anniversary of the Closing);

(ii) any Environmental Liabilities (provided that Sellers' obligations to indemnify and hold harmless Buyer and Company shall apply only with respect to claims

arising prior to the tenth anniversary of the Closing);

(SAC Exhs. 1, 2, Merger Agreements §§ 11.02(f)(i), (ii).)

5. Section 2.2 of the Escrow Agreements states in full:

2.2 *Notice of Claims.* Promptly after the receipt by Buyer of notice or discovery of any claim, damage, or legal action or proceeding giving rise to indemnification rights under the Agreement (a *"Claim"*) Buyer shall give the Indemnification Representative written notice of such Claim and shall provide a copy of such notice to the Escrow Agent. Each notice of a Claim by Buyer (a *"Notice of Claim"*) shall be in writing, shall be delivered on or before the Release Date (as defined in Section 3.1 below) and shall contain a detailed account of the specific facts known to Buyer on which the Claim is based, including a description of the specific representation, warranty or covenant in the Agreement (if any) which Buyer reasonably believes has been breached. The No-

The clause does not set forth a time-period for filing an action. A review of these provisions indicates that, just as it is not necessary for a survival clause to use the word "claim" to constitute a contractual limitations period, the inclusion of the word "claim" in a provision does not render that clause a statute of limitations.

Plaintiffs also argue this Court must construe the first sentence of Section 11.01 in light of that sentence's "carve out" provisions. One of the carve out sections, Section 11.01(ii), provides that covenants set forth in Sections 6.06 and 7.01 survive indefinitely. Plaintiffs maintain that under Defendants' interpretation, that would mean the statute of limitations on those covenants also lasts indefinitely because the survival and limitations periods are coextensive. But this interpretation, according to Plaintiffs, would violate California law.

▪ The Court disagrees. The term "indefinitely" when used in survival clauses means that the applicable statute of limitations will govern from the date of breach. David A. Broadwin, *Negotiating and Documenting Business Acquisitions* 139 (ALI–ABA 1997) ("Somewhere either in the section on representations and warranties, the indemnification, or elsewhere, there should be a provision stating that the representations and warranties survive the closing either for an unlimited period (which would amount to the applicable statute of limitations for a contract) or for a fixed period."); John W. Herz and Charles H. Baller, *Business Acquisitions: Planning and Practice,* Volume I 164 (PLI 1971) ("The maximum survival period for seller's warranties is the period set out in the applicable statute of limitations for

commencing an action based on breach of warranty; a survival provision which is of indefinite duration will have a duration coextensive with the period in the statute of limitations for bringing suit for breach of such warranties."). Indeed, the survival clause in *Lincoln Nat'l* and *TakeCare* expressly excluded two enumerated representations and warranties from the contractual limitations period, providing they survived "indefinitely." *Lincoln Nat'l,* 1998 WL 281290 at *4. Notwithstanding those exceptions, the parties and the courts agreed the survival clause constituted a contractual statute of limitations.

Plaintiffs have cited four cases in support of their interpretation of the first sentence of Section 11.01. They first cite *Hurlbut v. Christiano,* 63 A.D.2d 1116, 405 N.Y.S.2d 871 (N.Y.App.Div.1978). There, plaintiffs agreed to purchase a nursing home from defendants. *Hurlbut,* 405 N.Y.S.2d at 872. The purchase agreement provided that defendants had complied with all laws, regulations, and orders materially affecting the operation of the business and that there were no existing or proposed laws, regulations, ordinances or orders of any governmental authority that would adversely affect the business. *Id.* The warranties were to survive the date of closing but no specific time period was established. *Id.* The agreement also provided that if plaintiffs claimed a breach of warranty, they were required to give written notice of such a claim to the defendants. *Id.* Shortly before the closing, an inspection of the nursing home resulted in a notice of approximately 42 hospital code violations. *Id.* Consequently, the parties reached an agreement whereby defendants placed $10,000 in escrow to be used for

tice of Claim shall specify whether the matter is subject to a third-party claim against Buyer or the Company in a litigation or arbitration or whether the matter concerns disputes regarding a breach of representa-

tions and warranties or performance or nonperformance of a party's obligations under the Agreement.

(SAC Exhs. 1, 2, Escrow Agreements § 2.2.)

correcting the violations. *Id.* That escrow agreement also provided that:

> "The parties hereto further agree that the representations and warranties set forth in Sections 4.01(d) and 4.03(g) of the Purchase Agreement between them dated February 29, 1972 shall survive the closing for a period of three (3) years."

*Id.* at 873.

Plaintiffs later sued to recover reasonable costs incurred in correcting various violations. *Id.* at 872. Defendants contended the suit was time-barred because it was not filed within the three-year survival period. *Id.* The court found plaintiffs' action was timely, and that the survival clause "is clear and unambiguous and suggests nothing from which a shortened period of limitations can be inferred." *Id.* at 873.

*Hurlbut,* however, does not compel this Court to adopt Plaintiffs' interpretation. When interpreting the survival clause, the *Hurlbut* court considered the circumstances under which the escrow agreement was entered. *Id.* The court noted that plaintiffs had just become aware of the extensive violations that required expenditure of funds to be corrected. *Id.* The court stated the provision was "clearly a precaution to protect [plaintiffs] against existing violations for which no notices had as yet been received and which, in the absence of this agreement might not be actionable." *Id.* The clause thus rendered the sellers liable for existing deficiencies that would be formally noticed during a three-year period after the closing. *Id.* Therefore, the court concluded the parties neither expressly nor impliedly shortened the applicable six-year statute of limitation. *Id.*

In contrast to *Hurlbut,* there is no evidence regarding the negotiation of the Merger Agreements that suggests there were outstanding matters regarding Tera-

dyne's representations in Sections 5.11 and 5.13. Indeed, evidence regarding the negotiations between the parties in this case shows there were no meaningful discussions regarding the first sentence of Section 11.01. Teradyne prepared the draft agreement that contains, with very little modification, the same language that appears in the first sentence of Section 11.01. (*Compare* Plts' Exh. C, July 10, 2000 Draft Stock Purchase Agreement at 34 *with* SAC Exhs. 1, 2, Merger Agreements § 11.01.) The only changes made during the negotiations to the first sentence of Section 11.01 involved the "carve out" subsections that are inapplicable here. (*Compare* Plts' Exh. C, July 10, 2000 Draft Stock Purchase Agreement at 34 *with* SAC Exhs. 1, 2, Merger Agreements § 11.01.)

Deposition testimony of the parties' corporate counsel also does not illuminate what the parties intended by the first sentence of Section 11.01. William Asher and Laurie Cerveney, Teradyne's corporate counsel, testified they were not aware of anyone saying or writing that they understood that Section 11.01 of the agreement altered California's four-year statute of limitations for breach of contract actions. (*See* Asher Depo. at 16:21–17:18; 18:20–19:15, 19:23–20:4, 48:19–23; Cerveny Depo. at 14:2–21.) Robert Copeland, Plaintiffs' counsel, also testified he did not believe Section 11.01 set forth a cut-off date. (Copeland Depo. at 36:6–13.)

This Court cannot interpret counsel's silence during the negotiations as indicative of the parties' subjective intent as to whether the first sentence of Section 11.01 was to be a contractual statute of limitations. Under California law, "the true intent of a party is irrelevant if it is unexpressed." *United Commercial Ins. Serv., Inc. v. Paymaster Corp.,* 962 F.2d 853, 856 (9th Cir.1992); *Badie,* 67 Cal.

App.4th at 802 n. 9, 79 Cal.Rptr.2d 273; *Shaw*, 58 Cal.App.4th at 54–55, 67 Cal. Rptr.2d 850.[6] However, the absence of evidence regarding any outstanding concerns relating to Teradyne's representations in Sections 5.11 and 5.13 distinguishes this case from *Hurlbut*. Further, unlike *Hurlbut*, in this case it is questionable whether Sections 5.11 and 5.13 of the Merger Agreements could be breached after the closing. (*See* Copeland Depo. at 132:11–133:11, 243:12–244:7.) [7]

Plaintiffs also cite *Southland Corp. v. Ashland Oil, Inc.*, 696 F.Supp. 994 (D.N.J. 1988). There, the purchaser of a chemical plant sued the vendor, seeking a declaration that the vendor was strictly liable to the purchaser for environmental cleanup costs in contribution and indemnity under CERCLA. *Southland Corp.*, 696 F.Supp.

at 996. The vendor also sought indemnity under the purchase agreement. *Id.* at 1003. The purchase agreement contained a clause stating that "[a]ll of the representations, warranties, promises and agreements of the parties set forth in this Agreement shall survive the Closing for a period· of two (2) years ... regardless of what investigations the parties may have made before the Closing." *Id.* at 1001 n. 8. (alteration in original). The vendor argued that any indemnity claim terminated in 1980 because of the two-year statute of limitations. *Id.* The court stated that the language in the survival clause "plainly places a two-year limitation on 'all of the representations, warranties, promises and agreements' made by the parties." *Id.* at 1004. The court concluded that any affirmative promise to indemnify by the vendor

---

6. For this reason, insofar as Plaintiffs contend that Defendants' interpretation would mean Plaintiffs unintentionally waived their right to bring a breach of contract claim, that argument is unpersuasive because Plaintiffs' subjective intent is irrelevant.

7. At his deposition, Plaintiffs' corporate counsel, Robert Copeland testified:

Q If the representation that Teradyne made in Section 5.11 of the merger agreement, as buttressed by Section 5.13 of the merger agreement, was true, complete, and accurate as of the closing date, could Teradyne have breached that provision after the closing date?
A I can't give you a legal answer to it. I guess in my opinion, probably not.
Q Because Teradyne represented, in the MAC representation in Section 5.11, that through the date it executed the agreement, there hadn't been a material adverse change in its business condition, correct?
A Yes.
Q And by executing the bring-down certificate, Teradyne reaffirmed that as of the closing date two weeks later, the representation that it made in Section 5.11 remained true as of that date, correct?
A Right.
Q Following the·closing date, if Teradyne had experienced a material adverse change on any day after the closing date,

that would not constitute a breach of the representations that Teradyne made to the Herrings, correct?
. . .
THE WITNESS: The way that you have defined it, I think that's probably correct. (Copeland Depo. at 132:11–133:11.)
Copeland was later asked:
Q Can you give me any example of how a party who made a representation of existing fact that was true as of the closing date could breach that representation after the closing date?
. . .
A I can't—I can't answer the question.
BY MR. HERSHMAN:
Q You can't give me—·
A I can't give you an answer.
Q You can't give me any such example, can you?
A I can't think of one right now.
Q That's because it can't be done, right, sir?
A I don't know.
Q You can't think of any way right now it could be, correct?
A I can't think of anything right now under oath. I might be able to think of something if I was given time.
(Copeland Depo. at 243:12–244:7.) ·

terminated two years after the Closing. *Id.* The purchaser argued it had filed a timely notice of claim. *Id.* The court held that a cause of action based on breach of the contract's indemnity provision accrued at the time the vendor failed to respond to the purchaser's claim, in 1980, and therefore the claim was time-barred under New Jersey's six-year statute of limitations for claims based on contract. *Id.*

Plaintiffs argue that *Southland* drew a distinction between the period when a cause of action for breach of a representation or warranty can arise, and when a claim for the breach of the representation or warranty must be brought. Insofar as *Southland* implies that a survival period is separate and distinct from the time in which to file suit, the case supports Plaintiffs' position. Nevertheless, this Court declines to adopt Plaintiffs' proffered interpretation. *Southland* did not set forth its reasoning as to why the survival clause was a period within which a breach could occur, or why New Jersey's statute of limitations was the applicable limitations period.

Similarly, *Hambrecht & Quist*, a case this Court noted in the order denying Defendants' motion to dismiss, implies that survival clauses set forth the time in which a breach can occur as opposed to setting a cutoff for the filing of claims. There, the court determined whether a contract's choice-of-law provision incorporated Delaware's statute of limitations. *Hambrecht & Quist*, 38 Cal.App.4th at 1538–44, 46 Cal.Rptr.2d 33. The plaintiffs argued that the contractual provision regarding the survival of representations, warranties, and covenants showed that when the parties wished to deal with "timing" issues they expressly did so and therefore the absence of a "time to sue" clause or an explicit reference to Delaware's statute of limitations meant that the parties intended California's statute of limitations period to

apply. *Id.* at 1544 n. 10, 46 Cal.Rptr.2d 33. The California appellate court disagreed, finding that "[b]y using the term "laws" in the choice-of-law provision, the parties incorporated Delaware's statutes of limitations without the need for any additional contract language." *Id.* The court then noted that "a provision specifying the life of a warranty has no bearing on the time period for filing suit after the warranty has been breached." *Id.* But the Court's statement was in dicta, devoid of any analysis on the issue. Accordingly, this case also does not mandate Plaintiffs' interpretation.

Finally, Plaintiffs cite *Perini Corp. v. City of New York*, 178 F.3d 90 (2d Cir. 1999). There, a contractor sued the city for delay damages incurred when the city ordered the contractor to stop work on a bridge reconstruction project. *Perini*, 178 F.3d at 92. The city sought summary judgment, arguing that article 53 of the agreement time-barred those claims. *Id.* That article provided that no action shall lie or be maintained against the city by the contractor upon any claims based upon the Agreement unless the action was commenced within four months. *Id.* The contractor argued that article 53 only applied to claims under the Agreement and not to its claims which were brought under an Addendum. *Id.* The court found significant that the Agreement distinguished between the "Agreement," "Addendum," and "Contract," and concluded that article 53 did not bar the contractor's claims. *Id.* at 94–95. In so holding, the court found that the city could easily have worded a period of limitations intended to cover claims arising out of the Addendum as well as the Agreement. *Id.* at 95. Accordingly, the dispute in *Perini* did not center on whether a clause constituted a contractual limitations period, but rather whether the claim was covered by the contract that contained

a contractual limitations period. For this reason, *Perini* is inapposite.

In summary, the Court finds that Plaintiffs' cases do not mandate that the first sentence of Section 11.01 be interpreted as setting forth the time period within which a breach can occur.

### CONCLUSION

The parties have not presented, nor has this Court found, any binding precedent governing the issue presented in this motion. However, the treatises presented to the Court indicate that where an agreement does not provide that representations and warranties survive the closing, they extinguish on the closing date and cannot thereafter give rise to any claim of liability. It follows then that where an agreement provides that representations and warranties "survive," a party can sue for breaches of the representations and warranties, but only during the time period the contract states those representations and warranties survive. Therefore, if they survive indefinitely, then the state's four-year statute of limitations would apply from the date of the breach. But if the survival clause states that the representations and warranties survive for a fixed period of time, it follows that once that time period has elapsed, a party cannot sue for breach of the representations and warranties, absent circumstances surrounding the negotiations that would counsel against such an interpretation, such as in *Hurlbut*. Because the first sentence of Section 11.01 states that the representations and warranties at issue survive for one year after the Closing Date, and there is no evidence before the Court regarding the negotiations that suggest the clause should be read as a "breach period," the Court finds the reasonable interpretation of the first sentence of Section 11.01 is that it is a contractual statute of limitations. Accordingly, because Plaintiffs filed this action on September 5, 2001, more than one year after the August 15, 2000, Closing Date, Plaintiffs' breach of contract claims are time-barred. Good cause appearing, **IT IS HEREBY ORDERED** that Defendants' motion for partial summary judgment as to Plaintiffs' breach of contract claims is **GRANTED.**

**IT IS SO ORDERED.**